UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 18bk24763 |
| | ) | |
| Rosebud Farm, Inc., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Judge Timothy A. Barnes |
| | ) | |

MEMORANDUM DECISION

TIMOTHY A. BARNES, Judge.

The matter before the court has a tortured history made worse by the insistence of a claimant in charting his own path in the claims resolution process and the District Court's implicit acceptance of that behavior on appeal.[1]  It demonstrates some of the worst of claims litigation in bankruptcy.  At its best, it is about a dispute between an attorney and his former client—both creditors of the bankruptcy estate—over who should take first from litigation proceeds.  That is a matter better taken up by the state courts and not this one.  At its worst, it is a matter that has taken enormous amounts of time and energy from the court and the parties on what should have been a relatively straightforward chapter 7 liquidation, all while the estate's available assets are diminishing.

The matter comes on for consideration first and foremost on the Memorandum Opinion and Order of the District Court in *Longo v. Rosebud Farm, Inc.,* 638 B.R. 600 (N.D. Ill. 2022) [Dkt. No. 228][2] (the "Remand" or "*Longo*"), *appeal dismissed*, Case No. 22-1627, 2022 WL 10328334 (7th Cir. June 10, 2022).  But because of the issues raised in the Remand, the matter also involves the following:

1.  Claim Nos. 4-5, 4-6, 4-7, 4-8, 4-9 and 6-1 (collectively, "Claim No. 4" or the "Longo Claim");[3]

2.  Claim No. 5 ("Claim No. 5" or the "Smith Claim"); and

3.  Claim No. 7 ("Claim No. 7" or the "Longo/Smith Claim" and collectively with the Longo Claim and the Smith Claim, the "Claims").

Here the court has been forced to reengage with a difficult party over what should have been a straightforward matter.  The result, while it differs in the order of distribution from the estate, is

---

[1]     References to the "District Court" herein are to the United States District Court for the Northern District of Illinois.

[2]     Unless preceded by a reference to another case, all docket references in this Decision are to the docket in the above-referenced case.

[3]     Claims are numbered in reference to the claims docket in the above-captioned case.

not substantively different than what was first ordered by the court.  The court then declined to determine the parties' rights vis-à-vis each other and does so here again.

As this court has stated on a number of occasions, the court's role in claims litigation is narrow.  It is to determine what, if anything, a party should be allowed to take from a bankruptcy estate.  It is not to replicate the merits litigation between parties that would have occurred outside of bankruptcy.  To do the latter would grind bankruptcy matters to a halt and defeat the purpose of efficient and timely adjudication of bankruptcy cases.  It is even more limited when much of that claims litigation is about intercreditor disputes that do not affect the bankruptcy estate.

In keeping with the role, the court must first determine whether parties have met their burdens under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules" and as to each individually, "Bankruptcy Rule ___").  This results in quicker and narrower litigation of matters that, had they been heard at the District Court, would have involved more elaborate processes.  More often than not, an evidentiary hearing is not called for.  Claims resolution can and should be resolved without the need for testimony, which adds little to the evidentiary record before the court.  That is what has happened here, both before the Remand and after.

For the reasons more fully addressed herein, the court finds that Claim No. 4 may be allowed in part, but only as an unsecured claim.  Claim No. 5 is allowable as a secured claim, but not in the amounts asserted.  Claim No. 7 has no role in the Chapter 7 Case and is disallowed.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code.  28 U.S.C. § 1334(a).  The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b).  District courts may refer these cases to the bankruptcy judges for their districts.  28 U.S.C. § 157(a).  In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois.  N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy court judge to whom a case has been referred has statutory authority to enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(1).  Bankruptcy court judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(3).  As to the former, the bankruptcy court may hear and determine such matters.  28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court judge may hear the matters, but may not decide them without the consent of the parties.  28 U.S.C. §§ 157(b)(1), (c).  Absent consent, the bankruptcy court judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

2

In addition to the foregoing considerations, a bankruptcy court judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court judge hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead,* 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The claims objections described herein seek a determination by the court as to whether a claim should be allowed or disallowed pursuant to section 502 of the Bankruptcy Code. 11 U.S.C. § 502. This contested matter, concerning the allowance or disallowance of a claim against the bankruptcy estate, is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Further, in accordance with *Stern,* 564 U.S. at 499, the court has constitutional authority to decide claim objections, as such objections may arise only in a case under the Bankruptcy Code and necessarily stem from the bankruptcy case itself. *In re Montalbano,* 486 B.R. 436, 438–39 (Bankr. N.D. Ill. 2013) (Barnes, J.) (*citing Lenior v. GE Capital Corp. (In re Lenior*), 231 B.R. 662, 667 (Bankr. N.D. Ill. 1999) (Schmetterer, J.); *Knox v. Sunstar Acceptance Corp. (In re Knox*), 237 B.R. 687, 693 (Bankr. N.D. Ill. 1999) (Schmetterer, J.)). Further, questions of trustee distributions, under section 726 or otherwise, are also core proceedings and within this court's constitutional authority. *In re Bird,* 565 B.R. 382, 393 (Bankr. S.D. Tex. 2017).

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine the matter before the court as to whether the Claims should be disallowed and whether and how the estate funds should be distributed.[4]

HISTORY

The matter before the court has occurred in three essential stages. First, there was everything that led up to and included the claims litigation that proceeded the Remand. Following that, there was the Remand itself. Finally, there is the claims litigation that has followed the Remand.

The court will consider each in turn.

A.   The Initial History

Much of what is summarized here has already been set forth by this court in its prior ruling on the matter. *In re Rosebud Farm, Inc.,* 619 B.R. 202, 207 (Bankr. N.D. Ill. 2020) (Barnes, J.) [Dkt. No. 146] (the "Original Decision" or "*Rosebud Farm*"), *aff'd in part, remanded in part sub nom. Longo v. Rosebud Farm, Inc.,* 638 B.R. 600 (N.D. Ill. 2022).[5]

---

[4]   This conclusion will be revisited below, in the context of distribution under section 726 of the Bankruptcy Code.

[5]   Except where expressly stated otherwise, the court here adopts the findings of fact from the Original Decision.

3

The claims in question arise out of the following circumstances: On August 31, 2018 (the "Petition Date"), the debtor, Rosebud Farm, Inc. (the "Debtor"), filed the above-captioned chapter 7 bankruptcy liquidation (the "Chapter 7 Case"). Prior to that time, the Debtor operated as a local grocery store. In that capacity, it employed Robert Smith ("Smith") to work behind the meat counter and, during employment with the Debtor, Smith alleged that he was subject to sexual harassment in violation of Title VII, racial discrimination in violation of 42 U.S.C. § 1981, retaliation in violation of Title VII and section 1981, and gender violence in violation of the Illinois Gender Violence Act. *See Smith v. Rosebud Farmstand*, Case No. 11-cv-09147 (N.D. Ill. filed December 23, 2011) (the "Prepetition Action"). A jury found in favor of Smith on all the foregoing. *Smith v. Farmstand*, No. 11-CV-9147, 2016 WL 5912886 (N.D. Ill. Oct. 11, 2016), *aff'd sub nom. Smith v. Rosebud Farms, Inc.*, 898 F.3d 747 (7th Cir. 2018).[6]

Longo and Associates Ltd. and Joseph Anthony Longo (collectively, "Longo") represented the plaintiff, Smith, in the Prepetition Action. Final judgment in the Prepetition Action was entered against the Debtor and in favor of Smith on July 24, 2017, effective retroactively from July 14, 2017, in the amount of $559,656.57. Judgment in a Civil Case [Prepetition Action, Dkt. No. 339] (the "Judgment"). The Judgment was recorded with the Cook County Recorder of Deeds on September 18, 2017, which placed a judgment lien on the Debtor's real estate in Cook County. Memorandum of Judgment, filed as Claim No. 4-4, at pp. 1–4 (the "Recorded Judgment"). The Judgment was later affirmed on appeal, on August 2, 2018. *See Smith v. Rosebud Farm, Inc.*, 898 F.3d 747 (7th Cir. 2018).

The Judgment did not address or include attorneys' fees. As the District Court had previously stated, "[i]f Plaintiff wishes to pursue attorneys' fees in this case, he must file a separate fee petition with the Court addressing his entitlement to such fees, and the Court will set a briefing schedule on Plaintiff's motion at that time." *Smith v. Farmstand*, Case No. 11-CV-9147, 2016 WL 5912886, at *25 (N.D. Ill. Oct. 11, 2016). Smith did so and, on August 23, 2018, the District Court awarded Smith attorney's fees under a federal fee shifting statute in the amount of $611,388.50 and costs in the amount of $3,868.71, for a total $615,257.21, to be paid by the Debtor. Memorandum Opinion and Order [Prepetition Action, Dkt. No. 474] (the "Fee Award"). Smith had sought attorney's fees and costs in the amount of $1,396,358.71.[7]

---

[6]    Despite at least one reference by the Trustee of this being a d/b/a of the Debtor, the parties in this matter never explain how a judgment against "Rosebud Farmstand" equates to one against "Rosebud Farm, Inc.," the Debtor, when Rosebud Farmstand is not listed as an alternate name for the Debtor on its Petition. *See* Official Form 201, Voluntary Petition for Non-Individuals Filing for Bankruptcy [Dkt. No. 1]. Still, the Seventh Circuit's ruling on appeal on the Prepetition Action changes the name from Rosebud Farmstand to Rosebud Farm, Inc., d/b/a Rosebud Farmstand. That is good enough for the court, but the court reminds the parties that the incompleteness of their arguments contributes to delay.

[7]    In the Original Decision, the court imprecisely stated that "the District Court awarded Longo attorney's fees under a federal fee shifting statute … and costs …." *Rosebud Farm,* 619 B.R. at 207. That is incorrect. While at other points the court correctly surmised that "[t]he Recorded Judgment is an award of damages against the Debtor in favor of Longo's client, Smith," *id.* at 210, the imprecision of the former statement is unfortunate.

A careful review of the Fee Award makes clear that the District Court awarded the attorneys' fees and costs to Smith, not Longo. *See* Fee Award at p. 38 ("[T]he Court awards Plaintiff $611,388.50 in attorney's fees and $3,868.71 in costs …."). This is consistent with the statute under which fees had been sought. *See* 42 U.S.C.

After the Fee Award was entered and the Judgment affirmed on appeal, the Debtor filed the Chapter 7 Case. In the Chapter 7 Case, the bar date for filing claims was set forth February 5, 2019 (the "Bar Date"). *See* Notice Fixing Time for Filing Claims [Dkt. No. 18]. On February 4, 2019, Longo filed Claim No. 4-1, asserting a secured claim against the Debtor's estate for attorney's fees and costs in the amount of $1,780,258.71. *See* Claim No. 4-1 (as supplemented on January 28, 2020, the "Original Claim"). The Original Claim was therefore timely under the Bar Date. Note that the Original Claim was not a claim by Smith, the party to whom the attorney's' fees had been awarded and exceeded both what Smith had sought from the District Court and what the District Court had awarded.

In addition to filing the Original Claim, Longo became active in the case, filing a motion to modify the automatic stay to seek collection on the Original Claim in the District Court, a motion to dismiss and a motion to stay all proceedings, all of which this court denied. *See* Orders [Dkt. Nos. 48, 52, 60]. Longo sought leave to appeal this court's denial of his request for dismissal, but the District Court denied that request. Order [Dkt. No. 82].

With respect to the Original Claim, on October 28, 2019, Alex D. Moglia, not individually but in his capacity as chapter 7 trustee (the "Trustee") in the Chapter 7 Case, filed an objection, (the "Original Objection"), "on the ground that Longo [had] failed to establish the secured status of the Claim or entitlement to an amount greater than $615,257.21." *Rosebud Farm*, 619 B.R. at 205. On January 28, 2020, after the matter had been briefed and without leave of the court, Longo filed new documentary materials. *See* Claim Nos. 4-2, 4-3, 4-4.[8]

On January 29, 2020, at a hearing on the Original Objection, Longo orally sought leave to conduct additional discovery. The Trustee objected to both the taking of discovery after the matter was fully briefed and to the inclusion of Longo's late-filed documentary materials. Despite the procedural issues, for the purpose of considering the Original Claim on its merits, the court determined that it would consider the late-filed documentary materials. Scheduling Order [Dkt. No. 142]. The court once again explained to Longo that discovery would only be permitted if it were first established that Longo had filed a claim that complied with the Bankruptcy Code and Bankruptcy Rules. As a result, no discovery was permitted. *Id.* Given the inclusion of the late-filed documentary materials, the court afforded the Trustee an opportunity to file a sur-reply. *Id.* In that sur-reply, the Trustee conceded therein that Longo is entitled to a general unsecured claim in the amount of the Fee Award, $615.257.21. Trustee's Sur-Reply to Amended Claim Filed by Longo and Associates Ltd[.]/Joseph Anthony Longo [Dkt. No. 143], at p. 1.

With that filing, the matter was taken under advisement. On August 25, 2020, the court issued the Original Decision, ruling on the matters under advisement. *Rosebud Farm,* 619 B.R. at 202. In the Original Decision, the court (1) denied Longo's request for discovery; (2) found that the Original Claim was not secured by the Recorded Judgment, the Illinois Attorneys Lien Act, 770

---

§ 2000e-5(k) (providing that the prevailing *party* may be allowed attorney's fees). Nothing in the Fee Award or the statute gives rise to a direct right to payment for the attorney.

[8]     These additional documents "were filed on the eve of the continued hearing on the [o]bjection, after the [o]bjection had been fully briefed according to the court's scheduling orders, and without including the amended proof of claim form, despite being filed on the claims docket as if the materials themselves were amended proofs of claim." *Rosebud Farm*, 619 B.R. at 208.

ILCS 5/0.01 *et seq.* (the "Attorneys Lien Act"), or an equitable lien; and (3) allowed Longo's general unsecured claim in the amount of $615,257.00. *Id.* at 202–14.

As to the discovery request, the court concluded that Longo had the opportunity to request discovery after the Original Objection was filed on October 28, 2019, but he instead sought additional time to file a response brief and "proceeded with briefing the objection as if discovery was unnecessary." *Id.* at 209. After the matter had been briefed, Longo made an oral request for discovery at a hearing on January 29, 2020, primarily seeking "information or materials related to the notice or notices mailed or recorded when the Prepetition Action was initiated." *Id.* at 209. As the Original Objection and the issue of sufficiency of the Original Claim were fully briefed without such a request, the court determined that it would not "allow the parties to relitigate the [o]bjection by conducting discovery after the matter [had] been fully briefed." *Id.*[9]

As to the secured nature of the Original Claim, the court summarized Longo's three theories as follows: "First, that the Recorded Judgment secured the later Fee Award; [s]econd, that [the Original Claim] is secured under the Illinois Attorneys Lien Act …; and last, that [the Original Claim] is secured by an equitable lien." *Id.* at 210. The court found that none of these theories prevailed. *Id.* at 210–13.

First, the court found that the Fee Award, not the Recorded Judgment, formed the basis of Claim No. 4 but the Fee Award was never recorded. *Id.* at 210. The court found that the creation of a judgment lien under applicable Illinois state law requires strict compliance with 735 ILCS 5/12-101, that the term "costs" appearing in the Recorded Judgment and recorded on September 18, 2017, does not thereby secure the Fee Award entered on August 23, 2018, and that, even if the Fee Award were secured thereby, "Longo is not listed in the Recorded Judgment as the name of the party in whose favor the claim lies—Smith is." *Id.* at 211.[10] As the court then stated, Longo has presented no evidence that the Fee Award was recorded, nor any authority supporting the proposition that an unrecorded judgment order can give rise to a judgment lien for a sum certain based on the recordation of a prior judgment. *Id.*

Second, the court found that while the Attorneys Lien Act governs aspects of the relations between Longo and Smith, Longo's client, only if the conditions therein are met does the Act give an attorney a lien "upon all claims, demands and causes of action" pursued by the attorney on behalf of the client in an amount set by agreement or, in the absence of a contractual term setting the amount of fees, a reasonable amount. 770 ILCS 5/1. Actual notice of the lien must be given by the attorney to the opposing party and "*attorneys* shall serve [such] notice in writing … by registered or certified mail, upon the party against whom their clients may have such suits, claims or causes of action, claiming such lien and stating therein the interest they have in such suits, claims, demands or causes of action." *Id.* (emphasis added). The lien will attach only "from and after" the time of such

---

[9]    It was not lost on the court then and has not been lost since that all the information Longo sought to obtain from the Trustee was information that Longo, as counsel to Smith, would have been the source for. It was Longo who controlled how notices were sent, when and to whom. It was Longo who was responsible for keeping such information or who had the best access to public records and it was Longo who was responsible for providing the same to the court to support his claims. Asking for such information from a chapter 7 trustee largely unfamiliar with the operations of a defunct debtor is presumptuous, to say the least.

[10]    Though not before the court at that time, Smith has since filed such a secured claim for the Recorded Judgment as Claim No. 5 and the Smith Claim is considered further below.

service. *Id.* The court found that strict compliance with the terms of the Attorneys Lien Act is required and that "the following conditions must be present for an enforceable lien to exist: (1) the existence of an attorney-client relationship whereby the attorney is to pursue the claim on the client's behalf; (2) proper service of the notice of attorney's lien on the opposing party during the existence of such attorney-client relationship; and (3) such opposing party must actually receive the notice." *Rosebud Farm,* 619 B.R. at 212 (citations omitted).

Considering all that Longo had offered in support of this argument, the court concluded that Longo had not shown proof of a lien in his favor under the Attorneys Lien Act, had not presented evidence to show that he met his burden to serve the notice required by the statute upon the Debtor via one of the statutorily-mandated methods or that the Debtor actually received such notice, and had not demonstrated the existence and terms of the attorney-client relationship between him and Smith. *Id.* As the court stated, without proof that Longo has complied with the requirements of the Attorneys Lien Act, the court could not "conclude that [the Original Claim] is secured by virtue of the provisions of that statute" and, as a result, the Original Claim was not properly filed as a secured claim in accordance with the Bankruptcy Code and Bankruptcy Rules. *Id.*

Third, Longo argued that the Original Claim was secured by an equitable lien. *Id.* at 212–13. As the court then considered, an equitable lien depends "on the particular contractual language of the agreement or agreements governing the attorney-client relationship and are not imposed as a matter of law in the absence of evidence that the parties intended such a lien to attach to a specific *res.*" *Id.* at 213. Yet Longo did not submit any such agreement and, as such provided none of "the necessary proof for the court to conclude that an equitable lien for attorney's fees has arisen or should be imposed." *Id.*

Finally, this court determined that the amount of the Original Claim—the amount conceded by the Trustee and awarded by the District Court as the Fee Award—was $615,257.71, not $1,780,258.71 as Longo claimed. *Id.* at 214. The court noted that the majority of evidence presented by Longo in the Chapter 7 Case supporting his claim for a larger fee had already been presented to the District Court in the Prepetition Action and concluded that Longo was "seeking to relitigate his entitlement to attorney's fees in the Prepetition Action, an issue already determined by the District Court." *Id.* There was no reason, this court found, "to question the soundness or accuracy of the analysis set forth in the Fee Award." *Id.*

As a result, the court sustained in part the Trustee's Original Objection to the Original Claim and allowed the Original Claim as a general unsecured claim in the amount of $615,257.00. *See* Order Sustaining Claim Objection [Dkt. No. 147].

In response, on September 4, 2020, Longo filed a motion to amend the Original Decision. Movant's Motion for New Trial, Alter or Amend, Reconsider the 8/25/20 Disallowance Order [Dkt. No. 150]. After briefing, the court denied the motion in an oral ruling at a hearing on November 16, 2020. Order [Dkt. No. 159]. The court found that Longo had failed to establish either a manifest error of law or fact, or to present newly discovered evidence as a motion to alter or amend requires, noting that Longo could not use such a motion to ask the court to reconsider arguments that the court has already ruled on. Having failed to establish the presumption of validity for his claim when he failed to attach substantiating evidence to his proof of claim at initial filing or by amendment, Longo's case in support of the Original Claim failed.

Longo appealed both the Order Sustaining Claim Objection and the Order denying his motion for a new trial. *See* Notice of Appeal and, if Necessary, Motion for Leave to Appeal [Dkt. No. 160].

B.    The Remand

On appeal, Longo challenged three aspects of the Original Decision. Appellant's Statement of Issue on Appeal [Dkt. No. 168]. First, Longo challenged the conclusion that the Recorded Judgment did not secure attorneys' fees. Second, he challenged this court's conclusion that he had failed to produce evidence to support his claim of an attorneys' lien. Last, Longo challenged the conclusion that he had failed to serve the Debtor with notice of his claimed attorneys' lien, despite his failure to properly provide of the same in the claims docket of the case. *Id.*

On March 22, 2022, the District Court issued an order affirming the Original Decision in part and remanding the same in part. *See Longo*, 638 B.R. at 600. The District Court affirmed this court's finding that the Judgment did not create a secured lien in Longo's favor, *Longo*, 638 B.R. at 603, but remanded (1) the question of whether Longo had a lien under the Attorneys Lien Act; and (2) the question of whether Longo's agreement with Smith created an equitable lien, an unsecured lien or any lien at all. *Id.* at 606.

Addressing the question of whether Longo had a lien under the Attorneys Lien Act, the District Court found that, contrary to this court's findings, Longo "did submit evidence and the bankruptcy court failed to specifically address it. Longo filed an affidavit stating that: (1) his attorney-client agreement with Smith was for 45% of any recovery; and (2) he 'served Rosebud by certified mail with notice of attorney's lien and other documents.'" *Id.* at 604.[11] In addition, the District Court found that "prior to ruling on the Trustee's objection, the Bankruptcy Court implied that it would give Longo a further opportunity to submit evidence if necessary." *Id.*[12] Based on that incorrect observation, the District Court considered evidence provided by Longo on appeal but not provided to this court. *Id.* at 605.

---

[11]    In making these findings, the District Court did exactly what this court should not be required to do—it scoured *the docket* of the Chapter 7 Case to find filings by Longo to support his claim. *Longo*, 638 B.R. at 604; *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Jeralds ex rel. Jeralds v. Astrue*, 754 F.Supp.2d 984, 985 (N.D. Ill. 2010) (*citing DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999)). This treats a bankruptcy case docket like a docket in merits litigation in other courts. It reflects a fundamental misunderstanding by the District Court (shared by Longo) as to how the evidentiary record on claims is established and what role the bankruptcy case serves. As discussed below, the bankruptcy docket is the docket for the case as a whole. Longo was repeatedly directed by this court to amend his claim and attach whatever evidence he had to such claim as the proper place for evidence supporting a claim is in the *claims docket*. Instead, Longo stubbornly insisted on treating the bankruptcy case docket as an evidentiary record for the Original Claim. Bankruptcy dockets should not be used for this purpose and district courts should not condone parties refusing to follow appropriate bankruptcy procedures.

[12]    This court did nothing of the sort. Longo was repeatedly advised to file all the evidence he had in support of his claim on the claims docket of the case. He was told that only if that evidence raised a material issue of fact would an evidentiary hearing be held. He was never promised a later evidentiary hearing as such hearings only occur once a claimant has met the criteria for the same, the first of which is filing a sufficient claim. *In re Spiegel*, 657 B.R. 34, 51–54 (Bankr. N.D. Ill. 2024) (Barnes, J.) (explaining in great detail the stages of bankruptcy claims litigation).

8

In addressing the issue of an equitable lien, the District Court's determination is not as clear. It seemed to take issue with this court's conclusion that Longo had provided no agreement between Longo and Smith. *Id.* That conclusion is not subject to any reasonable dispute—he did not. What he did provide, as the District Court observed, is an affidavit stating that he had such an agreement. *Id.* As self-serving affidavits are of at least a nominal evidentiary value, *Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013); *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017), the District Court is correct to observe that this court should have considered more thoroughly whether that affidavit satisfied Longo's burden.

As a result, the District Court remanded with a request that this court clarify whether it had rejected Longo's argument for an equitable lien or whether it "conceded on reconsideration that… Longo's agreement with Smith created a lien, but that lien is unsecured." *Longo*, 638 B.R. at 606. Specifically, the District Court asked that this court either consider "the affidavits setting forth the terms of Longo's agreement with Smith," or identify and apply "the standard for when an equitable lien is secured." *Id.*[13]

C.      Post-Remand

After the Remand, the Trustee sought to establish a process to resolve the issues raised by the District Court. *See* Motion to Set Status Conference on Remand Issues [Dkt. No. 230]. At a hearing on that motion on July 13, 2022, the Trustee argued that Longo should be given the opportunity to introduce additional evidence, but that the Remand limited the issues to the Attorneys Lien Act and the equitable lien. Longo, in turn, argued that the Remand was not so limiting. Further, for the first time, Smith appeared (through counsel).[14]

At a subsequent hearing on August 31, 2022, the court reiterated to Longo that the evidentiary record for his claim consists of filings on the claims docket, not filings on the bankruptcy case docket. The court then continued the hearing to October 5, 2022, for the parties to consider

---

[13]      The question of how to treat a request from the District Court on remand is discussed in further detail below. As, unlike in remands from the Court of Appeals, there is no mandate to the lower court on such appeals, what the court must or should do is often unclear.

[14]      As this court noted in the Original Decision, the relationship between Longo and Smith for the purposes of the Chapter 7 Case has been less than clear. There the court observed:

> Smith's lack of participation in this case has been troubling, at best. Though Longo's claim, if allowed as secured, would result in Smith's claim being required to share in assets under section 725 of the Bankruptcy Code, Smith has never appeared or taken a position with respect to the issues considered herein and has reportedly not been responsive to inquiries from the Trustee's counsel. This is of particular concern given that Longo, who has made it clear that he no longer represents Smith, has nonetheless made statements in court that he has been communicating with Smith regarding these proceedings. This is, however, beyond the scope of the matter at bar and the court has not considered these circumstances in reaching today's conclusions.

*Rosebud Farm*, 619 B.R. at 211 n.5. When Smith's counsel first appeared, he sought to interject himself into the issues on remand. While that was initially not permitted by the court as the matter was a two-party dispute, after both Smith *and* Longo filed claims for Smith and after Smith filed a motion for joinder, *see* Robert Smith's Motion for Joinder to Proceedings on the Trustee's Objection to Claim No. 4 of Longo and Associates Ltd. and Joseph Anthony Longo [Dkt. No. 236], Smith's participation became necessary and was permitted. *See* Order on Robert Smith's Motion for Joinder [Dkt. No. 237].

and agree to a method by which Longo would amend the evidentiary record before the court by amending his claim. Instead of doing that, Longo once again insisted that this court should treat the bankruptcy case docket as the claims docket and take up the issues on remand without a clear record before it. *See* Creditor's Motion to Resolve First Issues in District Court's Remanding Order and Stay the Filing of a New Proof of Claim [Dkt. No. 239].

That attempt was flatly rejected by the court. *See* Order [Denying Motion] [Dkt. No. 241]. Instead, the court insisted that Longo do what he had been instructed to do once this matter arose—amend his claim—and entered an order to that effect on October 7, 2022. *See* Order Establishing Claims Bar Date and Setting Status Conference [Dkt. No. 243] (the "New Bar Date Order"). Among other things, the New Bar Date Order set December 9, 2022, as the new bar date for Longo to file an amended claim, made clear that any new claim would supersede the earlier claim, directed Longo to file his evidence attached to the new claim and directed Longo not to reargue matters resolved in the Remand or make reference to evidence not part of the claims docket. *Id.*

On December 8, 2022, in compliance with the New Bar Date Order, Longo filed Claim No. 4, thereby asserting a reduced secured claim against the estate for attorney's fees and costs in the amount of $1,160,539.83. *See* Claim Nos. 4-5, 4-6, 4-7, 4-8, 6-1. Claim No. 4 consists of four separate amounts: (1) the $615,257.21 statutory Fee Award; (2) $223,862.62 as 45% of the 7/17 judgment per the Attorney/Client Agreement with Smith (the "Percentage Recovery"); (3) interest; and (4) post-judgment attorney's fees (the "Post-Judgment Fees") totaling $321,420.00. *See* Claim No. 4-7, Exh., at pp. 1–2.

The following day, on December 9, 2022, once again not content to follow the court's orders, Longo filed the Longo/Smith Claim as "Robert Smith by agent Longo," asserting a secured claim against the estate in the amount of $936,677.21. *See* Claim No. 7. In an exhibit attached to the Longo/Smith Claim, Longo states that this claim was filed "as an alternative argument," if the court does not find his claim to be secured. *See* Claim No. 7, Appendix Attachment. Claim No. 7 consists of both the $615,257.21 Fee Award and the $321,420.00 Post-Judgment Fees. *Id.* at pp. 2–3.

Before the court could take up these issues, on January 17, 2023, the day before a scheduled status hearing, Smith objected to the Longo/Smith Claim arguing, *inter alia*, that Longo had no authorization to file the claim on behalf of Smith. Robert Smith's Objection to Claim No. 7 Filed by Longo and Associates Ltd./Joseph Anthony Longo Purportedly on Behalf of Smith [Dkt. No. 247] (the "Smith Claim No. 7 Objection"). Smith scheduled the Smith Claim No. 7 Objection to be heard on February 22, 2023.

At the January 18, 2023, status conference hearing, the court set an objection deadline for the Trustee on all claims for February 1, 2023, and set a hearing for February 22, 2023. [Scheduling] Order [Dkt. No. 251] (the "New Scheduling Order"). In accordance with the New Scheduling Order, on January 23, 2023, the Trustee filed two objections. Trustee's Objection to Amended Claim No. 4 Filed by Longo and Associates Ltd. and Joseph Anthony Longo [Dkt. No. 253] (the "Trustee Claim No. 4 Objection"); Trustee's Objection to Claim No. 5 [Dkt. No. 254] (the "Trustee Claim No. 5 Objection"). On February 1, 2023, the Trustee objected to the Longo/Smith Claim. Trustee's Objection to Claim No. 7 [Dkt. No. 257] (the "Trustee Claim No. 7 Objection"). All of the foregoing objections are referred to collectively herein as the "Objections." All three of the

10

Trustee's objections were set to be heard February 22, 2023, alongside the Smith Claim No. 7 Objection.

Four days before the hearing scheduled for February 22, 2023, Longo attempted to request a continued hearing, but filed only an order in that regard.  Order Granting Creditor's Motion to Continue All Matters Scheduled for 2/22/23 Without Requiring Appearance [Dkt. No. 260].[15] Longo did not appear at the February 22, 2023, hearing.  In his absence, the court set scheduling on the Objections.  Order Setting Briefing on Objections [Dkt. No. 270] (the "Briefing Deadlines Order").  The Briefing Deadlines Order provided that (1) Longo was to file responses to the Smith Claim No. 7 Objection, the Trustee Claim No. 4 Objection and the Trustee Claim No. 7 Objection on or before March 20, 2023; (2) Smith was to file a response to the Trustee Claim No. 5 Objection on or before March 20, 2023; (3) the Trustee was to file a reply, if an applicable response was filed, to support each of the Trustee Claim No. 4 Objection, the Trustee Claim No. 5 Objection and the Trustee Claim No. 7 Objection on or before April 3, 2023; and (4) if a response was filed, Smith was to file a reply in support of Smith Claim No. 7 Objection on or before April 3, 2023.  *Id.*

Given the history of noncompliance with the court's orders, the Briefing Deadlines Order set a hearing for April 19, 2023, and expressly stated that the deadlines in the Briefing Deadlines Order  may only be modified by motion, properly filed and noticed on all parties and filed and scheduled in accordance with the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the Northern District of Illinois.

Four days later, on February 27, 2023, Longo, the Trustee and Smith asked to vacate the Briefing Deadlines Order.  Joint Motion to Vacate February 23, 2023 Order Setting Briefing on Objections [Dkt. No. 272] (the "Motion to Vacate").  At a hearing on the Motion to Vacate on March 8, 2023, the court granted the Motion to Vacate, vacated the Briefing Deadlines Order and set a status conference for March 29, 2023.  Order Vacating February 23, 2023 Order Setting Briefing on Objections [Dkt. No. 275].

Five days before the status hearing on March 29, 2023, Longo again attempted to dictate to the court an alternative path for handling his issue.  Creditor's Motion (1) Stay Briefing on Objections Relating to Claim #7 Proof of Claim That Instant Creditor Filed on Behalf of Smith as an Alternative Until Ruling on Creditor's Main Proof of Claim, (2) for Ruling on the Appealed, Remanded Issues to Determine How or if the Issues Can Be Narrowed [Dkt. No. 276] (the "Motion to Stay Briefing").  The court once again flatly rejected Longo's attempts and denied the Motion to Stay Briefing.  Order [Denying Motion to Stay Briefing] [Dkt. No. 285].

In addition, Longo once again complicated the evidentiary record by seeking to augment his claim with additional evidence.  Creditor's Motion to Supplement Instanter Creditor's Proof of Claim with Attached [a] 12/31/11 Certified Mail Correspondence to Rosebud with the USPS Certified Mail Receipt, [b] Attorney/Client Agreement with Smith [Dkt. No. 286] (the "Motion to Supplement").  At this point, the court determined that it was easier to grant the request than insist that Longo follow the correct procedures and granted the motion.  *See* Order Granting Creditor's Motion to Supplement Instanter Creditor's Proof of Claim with Attached [a] 12/31/11 Certified

---

[15]     The order was docketed by Longo as a motion but was annotated by the clerk's office with an error on filing.  *See* Corrective Entry [Dkt. No. 261].  Longo was notified of the error via the docket, but made no correction of the same.

Mail Correspondence to Rosebud with the USPS Certified Mail Receipt, [b] Attorney/Client Agreement with Smith [Dkt. No. 287].[16] As a result, on March 30, 2023, Longo filed Claim 4-9, a document entitled "Exhibit A" that includes the receipt of mailing by certified mail for his Notice of Attorney's Lien mailed to the President or CEO of Rosebud Farmstand, the Attorney/Client Agreement between himself and Smith and the Assignment of Claim for Attorneys' Fees from Smith to Longo.

At the March 29, 2023, hearing, the parties agreed to a new set of deadlines, as follows: (1) Longo was permitted to file responses to the Smith Claim No. 7 Objection, the Trustee Claim No. 4 Objection and the Trustee Claim No. 5 Objection, on or before May 17, 2023; (2) Smith was permitted to file a response to the Trustee Claim No. 5 Objection on or before May 17, 2023; (3) the Trustee was permitted to file a reply, if an applicable response was filed, to support each of the Trustee Claim No. 4 Objection, the Trustee Claim No. 5 Objection and the Trustee Claim No. 7 Objection on or before June 7, 2023; and (4) if a response was filed, Smith was permitted to file a reply in support of Smith Claim No. 7 Objection on or before June 7, 2023. *See* Order Setting Briefing on Objections [Dkt. No. 288] (the "New Briefing Deadlines Order"). Once again, in the New Briefing Deadlines Order, the court cautioned the parties that "[n]o filings relating to the claims or objections addressed herein not expressly authorized herein are permitted." *Id.*

On May 17, 2023, in accordance with the New Briefing Deadlines Order, Longo filed four responses. Creditor's Response to Trustee's Objection to Claim #7 [Dkt. No. 289]; Creditor's Response to Trustee's Objection to Claim #4 [Dkt. No. 290]; Creditor's Response to Smith's Objection to Claim #7 Filed on Behalf of Smith Pursuant to Attorney/Client Agreement and Assignment of Attorney's Fees [Dkt. No. 291] (the "Longo Response"); and Creditor's Response to Trustee's Objection to Smith's Claim #5 [Dkt. No. 292] (the "Longo Unauthorized Response").[17]

On May 30, 2023, the Trustee timely filed two replies. Trustee's Reply to Response Filed by Longo and Associates Ltd[.] and Joseph Anthony Longo to Trustee's Objection to Claim No. 7 [Dkt. No. 293]; Trustee's Reply to Response Filed by Longo and Associates Ltd[.] and Joseph Anthony Longo to Trustee's Objection to Claim No. 4 [Dkt. No. 294].

On June 6, 2023, Smith timely filed a reply to the Longo Response. Robert Smith's Reply to Response Filed by Creditor Longo and Associates Ltd[.] and Joseph Anthony Longo to Robert Smith's Objection to Claim No. 7 [Dkt. No. 296] (the "Smith Reply"). Smith did not respond to the Trustee Claim No. 5 Objection. At the June 28, 2023, hearing, the court found that the matters were fully briefed and took them under advisement. At a further status hearing on March 27, 2024, the parties agreed that the evidentiary record was complete and that all that remained were the legal determinations relating to the facts.

---

[16] It is unclear why Longo sought to file Claim 4-9 at this time. Claim 4-9 included evidence Longo had already submitted in Claim 4-5. This will be discussed in more detail below. Nonetheless, as the District Court has implicitly endorsed Longo's cavalier approach to compliance with this court's orders and use of the bankruptcy case docket, there is little at this point that this court can do to curtail this behavior.

[17] Longo makes clear in the Longo Unauthorized Response that he knows he was not authorized to weigh in on the briefing between the Trustee and Smith on Smith's Claim. This filing was not permitted under the New Briefing Deadlines Order and is stricken without further consideration. *Cleveland v. Porca Co.*, 38 F.3d 289, 297 (7th Cir. 1994) ("[I]t is within the [] court's discretion to strike an unauthorized filing.").

12

The court has taken into consideration any and all exhibits submitted in conjunction with the foregoing filings and the claims docket in the Chapter 7 Case as it relates to the matters at bar. Though these items do not constitute an exhaustive list of the filings in this case, the court has taken judicial notice of the contents of the docket in this case. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

Having conducted such review, this Memorandum Decision constitutes the court's determination of the issues before it.

FINDINGS OF FACT[18]

From the above review and the consideration of the procedural background, as well as of the evidence submitted by the parties, the court determines the salient facts to be and so finds as follows:[19]

A.   Claim No. 5

1.   On September 18, 2019, by and through his counsel, Smith filed the Smith Claim. Claim No. 5.  This claim is asserted in the amount of $590,131.02 as a secured claim. *Id.*

2.   Per its express terms, Claim No. 5 "includes interest calculated at an average interest rate of 2[.]5% per annum on the judgment amount of $559,656.57 for the period from entry of the judgment on July 14, 2017, through the date of preparation of this claim on September 17, 2019…" for a total of $30,474.45 in interest.  Claim No. 5.

3.   Claim No. 5 arises out of the Judgment in the Prepetition Action.  Judgment in a Civil Case [Prepetition Action, Dkt. No. 339].

4.   The Prepetition Action alleged sexual harassment in violation of Title VII, racial discrimination in violation of 42 U.S.C. § 1981, retaliation in violation of Title VII and section 1981, and gender violence in violation of the Illinois Gender Violence Act.  *See Smith v. Rosebud Farm, Inc.*, Case No. 11-cv-09147 (N.D. Ill. filed December 23, 2011).

5.   A jury found in favor of Smith on all of the foregoing.  *Smith v. Farmstand*, 11-CV-9147, 2016 WL 5912886, at *1 (N.D. Ill. Oct. 11, 2016).

---

[18]   To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

[19]   For the purposes of clarity, the court will take up the claims in their logical order, not their claims docket order.  Thus, the court will consider first Claim No. 5, then Claim No. 7 and finally Claim No. 4.

<u>The Judgment</u>

6.    Final judgment in the Prepetition Action was entered against the Debtor and in favor of Smith on July 24, 2017, effective retroactively from July 14, 2017, in the amount of $559,656.57.  Judgment in a Civil Case [Prepetition Action, Dkt. No. 339].

7.    The Judgment consisted of two awards from the Debtor to Smith, as follows: (a) $279,656.57 in actual damages (the "<u>Actual Damages</u>"); and (b) $280,000.00 in punitive damages.  *Id.* (the "<u>Punitive Damages</u>").

8.    On behalf of Smith, on September 18, 2017, Longo recorded a Memorandum of Judgment with the Cook County Recorder of Deeds.  Memorandum of Judgment, filed as Claim No. 4-4, at pp. 1–4.

9.    The Recorded Judgment gave rise to a secured lien in the Debtor's real property in favor of Smith in the amount of the Judgment.  *Rosebud Farm*, 619 B.R. at 210.

<u>Kingdom Farms</u>

10.    After the Judgment was recorded, the District Court entered an agreed order dated January 23, 2018, with respect to Kingdom Farms Wholesale Meats, Inc. ("<u>Kingdom Farms</u>").  Agreed Order [Prepetition Action, Dkt. No. 435] (the "<u>Kingdom Order</u>").

11.    Kingdom Farms was a tenant of the Debtor under a lease that obligated Kingdom Farms to pay to the Debtor $5,000.00 on the first of every month.  Plaintiff's Reply to Rosebud's Response to Plaintiff's Motion for Turnover Order Relating to Kingdom Farms Meats [Prepetition Action, Dkt. No. 415], Exh. 3 (First Amendment of Lease Agreement), ¶ 3.

12.    The Kingdom Order required Kingdom Farms to turn over to Smith immediately $15,000.00 in held rental payments for the months of November 2017, December 2017 and January 2018.  Kingdom Order, p. 1.

13.    The Kingdom Order further required Kingdom Farms to turn over to Smith "in monthly rent coming due under the Lease … until further order of the court …" and provided that "[a]ll funds paid shall be applied towards the satisfaction of the judgment entered in this case."  *Id.*

14.    On September 18, 2018, the District Court stayed further payments on the Kingdom Order.  Notification of Docket Entry [Prepetition Action, Dkt. No. 482].

15.    As a result, under the Kingdom Order, Kingdom Farms appears to have paid to Smith $55,000.00 prior to the Petition Date.  *See* Trustee Claim No. 4 Obj., at ¶ 8.

<u>Prepetition Interest</u>

16.    Federal law permits post-judgment interest on the unpaid portion of the Judgment. 28 U.S.C. § 1961.  The applicable judgment rate of interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by

the Board of Governors of the Federal Reserve System, for the calendar week preceding the judgment." *Id.* Such interest is computed daily and compounded annually. *Id.*

17.     The applicable interest rate under section 1961 for the calendar week preceding the Judgment is 1.23% per annum as asserted by the Trustee. *See* https://www.federalreserve.gov/datadownload/; *see also* Trustee Claim No. 5 Obj., at ¶ 12 & Exh. B.

18.     Under Illinois law, a claim for such post-judgment interest would be secured as the Judgment is secured. *Cf. People, for Use of Fortune Bros. Brewing Co. v. Barrett*, 165 Ill. App. 94, 98 (1st Dist. 1911).

19.     None of the parties have calculated the prepetition interest on Claim No. 5 correctly. The court has done so in Table A attached hereto. Table A applies the correct rate of interest, accounts for the Kingdom Farms payments and compounds interest annually.

20.     For the reasons explained below, Table A also applies the Kingdom Farms payments first to accrued interest and thereafter to the Punitive Damages claim.

21.     As a result of those calculations, the court concludes that Claim 5 correctly asserts a secured claim but in the amounts as follows:

| | |
|---|---|
| Actual Damages: | $279,770.66 |
| Punitive Damages: | $232,477.86 |
| Total: | $512,248.52[20] |

Postpetition Interest

22.     Even as a secured claim, the Judgment would not normally accrue interest after the Petition Date, 11 U.S.C. § 502(b)(2), unless recovery of the property securing the Judgment exceeds the value of the Judgment and its prepetition accrued interest. 11 U.S.C. § 506(b).

23.     The net proceeds of the sale of the Debtor's real property is $670,855.79. Trustee's Report of Sale [Dkt. No. 120] (the "Sale Amount").

24.     As the Sale Amount exceeds the Judgment plus the Prepetition Interest, the Judgment is entitled to postpetition interest under section 506(b).

25.     Such interest accrues at the federal rate. 28 U.S.C. § 1961.

---

[20]     Because of necessary rounding and truncating, Table A calculates the total claim as one cent less than set forth here. The court has chosen to take the total of the two parts as more accurate and awarded the extra cent.

26.     Using the figures in paragraph 21 above, the court has calculated postpetition interest in Table B attached hereto.  Table B applies the correct rate of interest to both the Actual Damages and the Punitive Damages, as each are secured claims entitled to interest, calculates such interest from the Petition Date to the date of this Memorandum Decision and compounds interest annually.  28 U.S.C. § 1961.

27.     As a result of those calculations, the court concludes that Claim 5 is entitled to postpetition interest as follows:

Actual Damages:        $18,362.16

Punitive Damages:      $18,384.71

The Fee Award

28.     For the reasons discussed more fully below, while the Fee Award was awarded to Smith, it has been assigned to Longo and will be treated as part of Claim No. 4.

B.     Claim No. 7

29.     On December 9, 2022, Longo filed the Longo/Smith Claim.  Claim No. 7.  This claim is asserted in the amount of $936,677.21 as a secured claim.  *Id.*

30.     Claim No. 7 was filed by Longo on behalf of Smith, listing as the name of the creditor on the official B10 form "Robert Smith, assignor to assignee, Longo and Associates, Joseph Anthony Longo, for all fees."  *Id.*

31.     Longo states in Claim No. 7 that "[t]he agent/assignee has its/his own arguments regarding the secured nature of the statutory attorney's fees in the 8/18 District Court order," but that he only files this claim "as an alternative argument," "[d]epending upon how the Honorable Judge Barnes rules on [the] secured nature of [Longo's own claim]."  *Id.*

32.     Longo states further that "Smith's [Claim No. 5] is amended to include fees relating to the agent/assignee's … postjudgment work."  These additional fees amount to $321,420.00.  *Id.*

33.     For the reasons discussed below, Claim No. 7 is invalid.

C.     Claim No. 4

34.     December 8, 2022, Longo filed Claim No. 4.  Claim Nos. 4-5, 4-6, 4-7, 4-8 and 6-1.[21] On March 30, 2023, Longo filed additional exhibits to Claim No. 4.  Claim No. 4-9. These filings are collectively referred to herein as Claim No. 4 or the Longo Claim.

---

[21]     The multiple subclaim numbers and the separate Claim No. 6 all appear to be generated by the clerk's office in order to handle the mass undifferentiated filing by Longo.

35. Claim No. 4 supersedes the Original Claim per this court's orders. New Bar Date Order [Dkt. No. 243].

36. Claim No. 4 arises out of the prepetition representation by Longo of Smith in the Prepetition Action.

37. Claim No. 4 is asserted as secured and composed of: (1) "$615,257.21 of statutory fees pursuant to the 8/18/18 District Court statutory fee order in Smith v. Rosebud" (previously defined as the Fee Award); (2) "45% of the District Court recorded 7/17 judgment of $559,656.57(=$223,862.62) pursuant to the attorney/client agreement" (previously defined as the Percentage Recovery); (3) interest; and (4) $321,420.00 in "fees relating to the creditor's work … relating to postjudgment work, including collection, and to defend the 7/17 judgment which Rosebud appealed to the Seventh Circuit Court of Appeals" (previously defined as the Post-Judgment Fees). Claim No. 4.

The Fee Award

38. In the Prepetition Action, Smith was awarded attorney's fees under a federal fee shifting statute in the amount of $611,388.50 and costs in the amount of $3,868.71, for a total $615,257.21, to be paid by the Debtor. Memorandum Opinion and Order [Prepetition Action, Dkt. No. 474] (as previously defined, the Fee Award). The Fee Award is unsecured. *Longo*, 638 B.R. at 603.

39. Longo represented Smith in the Prepetition Action under a fee agreement dated November 1, 2011. Claim No. 4-9, Exh. A, Attorney/Client Agreement (the "Fee Agreement").

40. The Fee Agreement provides for fees in three parts: (a) retainer(s) in the amount of $0.00; (b) an hourly rate of $395.00 for which Smith was liable directly for the first hour for consultation and indirectly for fees from the respondent/defendant; and (c) a contingent fee in graduated percentages culminating in a fee of "45% of any recovery once a trial date is set." *Id.* at ¶¶ 2(a)–(c).

41. In addition to the Fee Agreement, Longo and Smith entered into an assignment by which Longo was assigned "all claims for attorneys' fees arising from or relating to any and all claims that [Smith] has or may have against [the Debtor] …." Claim No. 4-9, Exh. A, Assignment of Claim for Attorneys' Fees (the "Assignment").

42. Under the Assignment, Longo would be entitled to stand in the shoes of Smith in relation to the Fee Award.

43. Neither the Assignment nor the possibility of a claim against Smith's recoveries changes the conclusion that the Fee Award is unsecured vis-à-vis the bankruptcy estate.

44. As a result, Claim No. 4's claim for the Fee Award of $615,257.21 is appropriate only as an unsecured claim.

17

The Percentage Recovery

45. Under the Fee Agreement, Longo is also entitled to forty-five percent of the Judgment from Smith.  Fee Agreement, at ¶ 2(c).  As the Judgment consists, in allowed parts, of Actual Damages in the amount of $279,770.66 and Punitive Damages in the amount of $232,477.86 totaling $512,248.52, Smith is entitled to:

| | |
|---|---|
| Actual Damages: | $125,869.80 (45% of $279,770.66) |
| Punitive Damages: | $104,615.04 (45% of $232,477.86) |
| Total: | $230,484.84 |

46. Longo's recovery of his Percentage Recovery in relation to the Punitive Damages would be paid out of the subordinated Punitive Damages portion of the Judgment. Only if that subordinated aspect of the Judgment were paid would Longo receive his Percentage Recovery in relation to it.

47. Such a claim is against Smith's recoveries, not the Debtor or the bankruptcy estate.

Interest

48. As the Fee Award is unsecured, it is not entitled to seek postpetition interest from the bankruptcy estate.  11 U.S.C. § 502(b)(2).

49. The Fee Award is, however, the equivalent of a "money judgment in a civil case" and is, therefore, entitled to postjudgment interest.  28 U.S.C. § 1961

50. As the Fee Award was entered on August 23, 2018, and the Petition Date, August 31, 2018, the Fee Award is entitled to eight days of prepetition interest at the federal rate.  That means that the Fee Award is entitled $2.70 of interest.

51. As a result, the allowable amount of the Fee Award is $615,259.91.

The Post-Judgment Fees

52. Claim No. 4 also seeks $321,420.00 in "fees relating to the creditor's work … relating to postjudgment work, including collection, and to defend the 7/17 judgment which Rosebud appealed to the Seventh Circuit Court of Appeals."

53. The Post-Judgment Fees are asserted at the rate of $550/hour.  The Fee Award awarded Longo an hourly rate of $360/hour.

54. The Original Claim sought that same amount and that request was considered and rejected by the court in the Original Decision.  *Rosebud Farm*, 619 B.R. at 214.

55. On appeal, the District Court did not opine on the propriety of the Original Decision's ruling in this regard.  *Longo*, 638 B.R. at 606 (stating that it "makes no findings on the merits of Longo's claim.").

56.     The Post-Judgment Fees must therefore be discussed in further detail below.

The Secured Status of Claim No. 4

57.     In support of Claim No. 4's secured status, Longo provided evidence that on December 31, 2011, he sent by certified mail to Rosebud Farmstand a cover letter, which, in turn, states that he had enclosed the following: (1) a complaint; (2) a notice of a lawsuit and request to waive service of a summons; (3) two copies of the waiver; (4) an assignment of claim for attorneys' fees; (5) a notice of attorney's lien (the "Lien Notice"); and (6) a self-addressed stamped envelope.  Claim No. 4-9, Exh. A (the "Letter to Rosebud").

58.     That evidence included an unstamped, undated certified mail receipt regarding the Letter to Rosebud.  *Id.*

59.     Longo has also submitted several unsworn "affidavits," dated December 11, 2019, January 28, 2020, and September 4, 2020, describing the circumstances and mailing of the Letter to Rosebud and enclosures, including the Lien Notice.[22]

60.     This evidence is unrebutted, but does not serve to establish a secured claim against the bankruptcy estate.  Claim No. 4 is unsecured.

CLAIMS LITIGATION

Because of the complex nature of the claims litigation process, it is worth explaining the process as it normally proceeds and the approach this court normally takes.[23]

Because claims objections are contested matters, the judge hearing a claim objection has the discretion and authority to determine whether many of the rules governing adversary proceedings should apply and how evidence, if any, should be presented.  Fed. R. Bankr. P. 9014(c); *see also* Fed. R. Evid. 611; *United States v. Raddatz*, 447 U.S. 667, 677 (1980); *Marshall v. Blake*, 885 F.3d 1065, 1083 (7th Cir. 2018).

For a party such as Longo or Smith who wishes to assert a secured claim, their first responsibility in doing so is to comply with the applicable Bankruptcy Code sections, the requirements of Official Form 410 for asserting claims and the Bankruptcy Rules.  *In re Plourde*, 418 B.R. 495, 508–09 (B.A.P. 1st Cir. 2009); *see also* Official Form 410 (instructing the claimant to "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements."); Fed. R. Bankr. P. 3001(c)(1) (requiring claims based on writings to attach copies of such writings).

As noted above, both Official Form 410 and Bankruptcy Rule 3001(c)(1) require that the claimant attach evidence to claims asserted as secured.  Longo argues *inter alia* that a proof of claim,

---

[22]     The nature of these "affidavits" is discussed in further detail, below.

[23]     The claims litigation process is explained in greater depth in this court's opinion, *In re Spiegel*, 657 B.R. 34 (Bankr. N.D. Ill. 2024) (Barnes, J.).

signed under penalty of perjury, meets that burden even in the absence of evidence. That is clearly untrue. If it were, all proofs of claim so-signed would give rise to the presumption even if filed without compliance with Official Form 410 and the Bankruptcy Rules. This would turn bankruptcy claims litigation on its head, allowing parties to simply claim "the estate owes it because I said so." By the same token, attaching an affidavit in support does not in and of itself, constitute compliance or change this conclusion. While, as noted above, even self-serving affidavits have at least a nominal evidentiary value, *Tangherlini*, 724 F.3d at 967 & n.1; *McKinney*, 866 F.3d at 814, if the affidavit adds nothing to the claim not otherwise determinable from the claim's face, it is ultimately of no value.

If a claim fails to satisfy the requirements of the Bankruptcy Code, the Official Form 410or the Bankruptcy Rules in a material way, the objection goes no further, and the claim is disallowed. *Plourde*, 418 B.R. at 508–09; *Spiegel*, 657 B.R. at 53. At this stage, the court considers only the evidence submitted with Official Form 410. *Id.* If the claim is valid on its face, it is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a). A proof of claim filed in accordance with section 501 creates a rebuttable presumption in favor of the validity and the amount of the claim with the claim itself existing as *prima facie* evidence in support thereof. *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 704 (Bankr. N.D. Ill. 2014) (Barnes, J.) (*citing* Fed. R. Bankr. P. 3001(f)). Again, to serve as this *prima facie* evidence and create the rebuttable presumption, the claim must comply with the rules, including Bankruptcy Rule 3001, and lay out the facts necessary to support the claim.

It is worth reiterating here that without a validly submitted claim, the court need not consider the factors for disallowance under section 502. Only once a claim is properly submitted must the court take up the considerations in the section. Both Longo and the District Court appear to misapprehend this basic fact.

If the claim has been filed in accordance with the rules, creating the *prima facie* validity of Bankruptcy Rule 3001(f), then the objecting party bears the burden of going forward and must introduce evidence or legal authority of probative force equal to the allegations of the creditor's proof of claim. *In re McCoy*, 355 B.R. 69, 72 (Bankr. N.D. Ill. 2006) (Squires, J.). If the objector has produced some basis for calling into question the allowability of the claim, the burden shifts back to the claimant to produce evidence to meet the objection that the claim is allowable. *In re O'Malley*, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999) (Schmetterer, J.).

The third stage is akin to summary judgment. It allows the court to weigh whether there exists an evidentiary dispute sufficient to require an evidentiary hearing. In addressing this stage, the burden is on the claimant as the proponent of the claim. *Id.* While a party might request discovery for this stage, it is not automatic. In the same way a litigant cannot file an insufficient complaint seeking to discover evidence that might cause the complaint, with that later discovered evidence, to state a claim upon which relief may be granted, *Vexol S.A. De C.V. v. Berry Plastics Plastics Corp.*, 315CV00055TWPMPB, 2016 WL 4506877, at *5 (S.D. Ind. Aug. 29, 2016) ("Plaintiffs cannot use a threadbare complaint to justify conducting a fishing expedition in search of a viable cause of action."), a claimant cannot file a claim without supporting documents expecting to find such documents in discovery.

The court customarily hears all three initial stages and any responses thereto at a hearing on the objection. That hearing is not evidentiary in nature, except to the extent that a summary judgment motion considers the evidence produced at that stage. Witness testimony is not taken. Only if the proof of claim survives these challenges and a material fact is in dispute, might the

parties proceed to an evidentiary hearing where the burden remains on the claimant. *Id.*; Fed. R. Bankr. P. 9014(d). Prior to the final stage—an evidentiary hearing—the parties might be permitted to engage in the limited discovery made applicable to contested matters. Fed. R. Bankr. P. 9014(c). But as the Seventh Circuit has made clear, pretrial discovery is not a guaranteed right. *Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 409 (7th Cir. 1995) (stating that the Fifth Amendment "says nothing about pretrial discovery, for the most part an invention of the twentieth century. Even in criminal cases there is no constitutional right to pretrial discovery."). Further, the question of whether to conduct an evidentiary hearing at all on such matters remains within the discretion of the court. As this court stated in *Spiegel*:

> As the Supreme Court has stated, "[t]he guarantees of due process call for a 'hearing appropriate to the nature of the case.'" *United States v. Raddatz*, 447 U.S. 667, 677 (1980) (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). As the Seventh Circuit stated with respect to a bankruptcy court's determination on a question of good faith, another summary matter, that "[t]he bankruptcy court, exercising its sound discretion, is in the best position to determine when an evidentiary hearing on the issue of good faith is necessary." *Marshall v. Blake*, 885 F.3d 1065, 1083 (7th Cir. 2018), *overruled on other grounds by In re Wade*, 926 F.3d 447 (7th Cir. 2019). The Bankruptcy Code itself recognizes that there exist circumstances when even a hearing is not necessary, even where the Code states that the court's authority occurs after notice and a hearing. 11 U.S.C. § 102(1)(B).

*Spiegel*, 657 B.R. at 51.

An evidentiary hearing is not a panacea. It is not held for a party to submit additional documentary evidence that was not previously submitted. It is held to assist the court in determining the material facts that are submitted but are in dispute. If factual conclusions are inevitable (*e.g.*, if the court assumes all facts in dispute in favor of one party and that party still loses or if all challenges to evidence are taken as true but the challenger still loses), no testimony is appropriate as nothing can change the result. No hearing is necessary. *Accord Kiger v. United States*, 417 F.2d 1194, 1196 (7th Cir. 1969) (holding that a new trial is not necessary when there is no new evidence to be had, stating that "[i]t is axiomatic that this Court will not engage in an exercise in futility.").

Longo was given a full and fair opportunity to present all his evidence prior to the Original Decision. Though he chose to ignore the court's instructions, he was repeatedly directed to amend his claim to add any additional evidence he wished the court to consider. It was explained to him that such amendments are liberally permitted, but the court could not scour the docket of the main case to discover amongst his multitude of filings what should have been attached to the Original Claim but was not.[24] To the extent that Longo believed he should be given another chance, whether

---

[24] The courts in this Circuit have made this clear with respect to briefs. "It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties." *Sanders v. JGWPT Holdings, Inc.*, Case No. 14 C 9188, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). Instead, it is the "advocate's job ... to make it easy for the court to rule in his client's favor." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). "Judges are not like pigs, hunting for truffles buried in briefs." *Dunkel*, 927 F.2d at 956. "Nor are they archaeologists searching for treasure." *Jeralds*, 754 F.Supp.2d at 985 (*citing DeSilva*, 181 F.3d at 867); *see also Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 508 (N.D. Ill. 2011)

right or not, he got that through the Remand.  This is that chance and, once again, the evidence is insufficient.  Further proceedings on this matter would be an exercise in futility.

DISCUSSION

In many respects, the bankruptcy system in the United States is broken, and this Chapter 7 Case demonstrates that in several ways.  In 2018, I wrote that:

> The Bankruptcy Code as we know it today is the product of hard fought reforms in the 1970s.  Prior to the enactment of the Bankruptcy Reform Act of 1978 which, when codified, became the Bankruptcy Code, the bankruptcy law of the land was primarily that contained in the Nelson Act, Bankruptcy Act of 1898, Pub. L. No. 55-541, 30 Stat. 544 (superseded by the Bankruptcy Code), as substantially amended in 1938 by the Chandler Act. Bankruptcy Act of 1938, *210 Pub. L. No. 75-696, 52 Stat. 840 (same).
>
> As detailed in the legislative history to the Bankruptcy Code, prior to the Bankruptcy Code's enactment, bankruptcy law was mired in the "horse and buggy" era and had fallen into "disrepair."  H.R. Rep. No. 95-595 (1977), 1st Sess. 1977, *reprinted in* 1978 U.S.C.C.A.N. 5963, 5965 (the "House Report"); *see also* S. Rep. No. 95-989 (1978).  As a result, in 1970 Congress created a commission to study and recommend changes to the bankruptcy laws.  House Report, 1978 U.S.C.C.A.N. at 5963.  In 1973 the commission filed its final report, *id.*, which found that the "most severe problem in the bankruptcy administration was the court system."  *Id.* at 5965.  The report identified two problems.  First, the report noted that the "bankruptcy court ... is not truly and completely a court."  It was "not independent."  *Id.*  Second, the report noted that bankruptcy judges were required to be too involved in the administration of cases, not truly acting as judges.  *Id.* at 5965–66.

*In re Shelton*, 592 B.R. 193, 209–10 (Bankr. N.D. Ill. 2018) (Barnes, J.).

In *Shelton*, I observed that Congress's efforts to rectify this situation by enacting the Bankruptcy Reform Act of 1978 which, when codified, became the Bankruptcy Code, had in large part been thwarted by the precipitous rise in bankruptcy cases and the increasing complexity of a Bankruptcy Code that has become more and more mired in special-interest exceptions.  We are far from the "uniform" system of bankruptcy envisioned by our nation's founders.  *See* U.S. Const., Art. I. sec. 8, cl. 4.

Contributing to that lack of uniformity are the remnants of Reconstruction-era hesitance over carpet-bagging federal judges.  The Bankruptcy Act of 1898 introduced to bankruptcy jurisprudence the concept of summary and plenary jurisdiction.  *Wellness*, 575 U.S. at 669.  In summary matters, the court enforces its own authority and that of the bankruptcy laws to effectuate an expeditious settlement of the debtor's estate.  In plenary matters, the court acts in the stead of another court, adjudicating nonbankruptcy matters whose resolution involve the bankruptcy estate.

---

(summarizing the foregoing).  Such is true for briefs and is even more germane with respect to claims litigation—courts should not have to scour the docket for evidence in support of a claimant's claims.

*Id.* The concept here is to keep bankruptcy in its lane, not allowing an undue expansion of federal authority over matters best governed by state law.

Rather than working toward a uniform bankruptcy system, the Bankruptcy Code's enactment, resulting structure and the subsequent jurisprudence relating to the same has deepened this divide. Though the reform efforts targeted a true, complete and independent bankruptcy court, politics and factionalism amongst the courts has resulted in something altogether different. While Congress did envision a uniform system where bankruptcy courts could adjudicate all matters affecting the bankruptcy estate, whether arising under state or federal law, the Supreme Court in a series of opinions has viewed that not in light of the constitutional mandate to have a single, unified bankruptcy system, but instead as one challenging the independence and authority of the federal courts. *See, e.g., N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 54 (1982); *Stern,* 564 U.S. at 500–01; *Wellness*, 575 U.S. at 669.

As a compromise to the federal courts and in response to the *Northern Pipeline* case, Congress enacted in 1984 a hybrid system for bankruptcy jurisprudence, reinstating the summary/plenary distinction in the terms of core and noncore proceedings. 28 U.S.C. § 157(b).[25] While adjudication of claims against a bankruptcy estate are expressly core proceedings, 28 U.S.C. § 157(b)(2)(B), not all that comes with such adjudication is either core or, even if it is core, is within the bankruptcy court's constitutional authority under this hybrid system. *Stern,* 564 U.S. at 503 (a counterclaim by an estate against a claimant is not within the bankruptcy courts' constitutional authority).

The Supreme Court attempted to recharacterize these issues in terms of existing constitutional jurisprudence, and thus discussed heavily in *Stern* the difference between public and private rights disputes. *Id.* at 490-500. While this adds another, sometimes-stultifying layer to how bankruptcy matters are resolved in the United States, it does little to change the fact that bankruptcy courts are nowhere near as empowered as they ought to be in a fulsome, modern bankruptcy system.

Compound this with the attempt in the Bankruptcy Rules to preserve the distinction between how summary and plenary matters are heard by applying some, but not all, of the Federal Rules of Civil Procedure to bankruptcy adversary proceedings, Fed. R. Bankr. P. 7001, *et seq.*, and even less to so-called contested matters such as claims disputes, Fed. R. Bankr. P. 9014, *et. seq.*, and the fact that appeals from the bankruptcy courts are mostly heard by district courts less experienced in bankruptcy jurisprudence and procedure, adjudicating bankruptcy matters is akin to walking through a legal minefield.

When faced with such challenges, the conservative approach is to stick to the basics. It has been observed that bankruptcy judges regularly decline to extend discretion where other judges

---

[25]    Ironically, though the modifications to section 157(b) incorporated almost verbatim the Emergency Rule circulated by the Judicial Conference of the United States, *see, e.g., In re Comm. of Unsecured Creditors of F S Communications Corp.*, 760 F.2d 1194, 1198 (11th Cir. 1985), making it the Supreme Court's attempt to patch the gaps created by *Northern Pipeline*, this fix, too, was found by the Supreme Court to be unconstitutional. *Stern,* 564 U.S. at 502–03.

might, whether it be out of fear of the limits on their authority or the ever-present possibility of being reversed by a higher, less-informed court.[26]

Here, the court is faced with a very difficult claimant. The District Court has recognized as much, and not just in the Fee Award. Fee Award, at p. 7 (citing to *Sommerfield v. City of Chicago*, 06 C 3132, 2012 WL 5354987, at *3 (N.D. Ill. Oct. 29, 2012), *report and recommendation adopted,* 06 C 3132, 2013 WL 139502 (N.D. Ill. Jan. 10, 2013), *aff'd,* 863 F.3d 645 (7th Cir. 2017) ("[H]is willful misconduct time and time again results in needless and unreasonable expenditures of time for which he invariably seeks compensation through inflated fee awards …[.] [C]ourts have repeatedly condemned his behavior in published opinions that could not be more critical of a lawyer.")). Longo regularly acts in defiance of the court's orders, files numerous meaningless and obstructionist demands and generally chooses to chart his own path rather than follow required procedures. The filing of Claim No. 7, as discussed below, is an illustrative example. Claim No. 4 is over 900 pages long. The majority of it is a data dump of Longo's time records, showing both a lack of judgment and a lack of respect for Judge Dow's efforts to explain to Longo in the Fee Award what time may be compensable and what may not.

Nero fiddled while Rome burned and Longo litigates while the iceberg of the estate melts. As demonstrated in the distribution discussion below, the time spent on this matter has come out of his pocket but runs the risk of affecting others. It also taxes the time of all concerned, when, as discussed below, his rights vis-à-vis Smith are unaffected.

The result is, unfortunately, reflected in this Memorandum Decision. It reflects the court's best efforts to deal with a difficult claimant and inform the District Court of what transpired below, while applying the process put in place by the Bankruptcy Code and Bankruptcy Rules, not some alternate system that might be in place should the issue be heard elsewhere.

A.      The Implied Mandate and the Law of the Case

The foregoing should help in explaining why, in this matter, though Longo has been insistent in his attempts to chart his own path in claims adjudication both before and after the Remand, those efforts have been unavailing. This court, in the *Spiegel* case published earlier this year, made extensive efforts to explain the claims adjudication process in bankruptcy. *Spiegel*, 657 B.R. at 51.[27] That analysis in *Spiegel* was in large part necessitated by the Remand in this case.

---

[26]      Diane Lourdes Dick, *Equitable Powers and Judicial Discretion: A Survey of U.S. Bankruptcy Judges*, 94 AM. BANKR. L.J. 265-302 (2020).

[27]      In writing *Spiegel*, the undersigned failed to stress one of the primary differences between claims adjudication and adversary matters. Adversaries require the service of a summons in order to establish jurisdiction over the parties. *See* Fed. R. Bankr. P. 7004. That is because these matters are in many ways akin to the merits litigation that plenary disputes would be entitled to outside of bankruptcy. Thus, jurisdiction over the parties need be established in a formal way. Claims adjudication, on the other hand, commences with an objection served under a less stringent standard. Fed. R. Bankr. P. 3007(a)(2). No doubt because of this lesser standard, the Bankruptcy Rules expressly prohibit a party from adding to a claims objection a matter that would otherwise require adversarial treatment. Fed. R. Bankr. P. 3007(b).

Though Longo, having ignored the Bankruptcy Rules and instructions of this court, has been afforded a second chance at proving his claim, the manner for how that is done must be determined by this court, not the District Court.

Bankruptcy matters on appeal to the District Court are governed by the Bankruptcy Rules, *see* Fed. R. Bankr. P. 8001, *et seq.*, while bankruptcy matters on direct appeal to the Court of Appeals, 28 U.S.C. § 158(d)(2), are governed by the Federal Rules of Appellate Procedure (the "Appellate Rules"). *See* Fed. R. App. P. 6(c). While the Appellate Rules contain a process by which the Court of Appeals may issue a mandate, Fed. R. App. P. 41, the Bankruptcy Rules do not.

A mandate requires a lower court "to conform any further proceeding on remand to the principles set forth in the appellate opinion." *In re Kimball Hill, Inc.*, 630 B.R. 294, 304 (Bankr. N.D. Ill. 2021) (Barnes, J.) (*citing to Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997)). When a matter is not fully remanded, a trial court must ordinarily "confine its discussion to the issues remanded." *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001).

The court is mindful of the Seventh Circuit's admonition in this regard. *Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993) (citing *Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982)) ("Ours is a hierarchical judiciary, and judges of inferior courts must carry out decisions they believe mistaken."). As the Seventh Circuit has further stated, "[t]he court may believe and even express its belief that our reasoning was flawed, yet it must execute our mandate nevertheless." *In re A.F. Moore & Assocs., Inc.*, 974 F.3d 836, 840 (7th Cir. 2020).[28] These comments, of course, were made in the context of an express mandate.

The lack of an express mandate means, however, that, other than with respect to the law of the case noted below, the bankruptcy court is not directly constrained by the instructions of the District Court. There is good reason for this, as such instructions might take the court into dangerous territory here, as they would if the court acted beyond its constitutional authority to answer questions asked in the Remand. The Supreme Court made clear in *Stern* that the bankruptcy court may not act outside of its constitutional authority, even in the face of a higher authority that might instruct it to do so. *Stern*, 564 U.S. at 503.

In *Kimball Hill*, this court chose to interpret that District Court's ruling as an implied mandate, much in the same way that the Appellate Rules state that in the absence of an express mandate, "the mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs." Fed. R. App. P. 41(a); *Kimball Hill*, 630 B.R. at 304. There the court wrote that, even in the presence of an express mandate, the court could depart from the principles set forth in the appellate opinion of the higher court if "there is a compelling reason to depart," such "'sufficiently compelling circumstances' include 'subsequent factual discoveries or changes in the law.'" *Id.* (*quoting Delgado v. United States Dep't of Just.*, 979 F.3d 550, 557 (7th Cir. 2020) (*citing Carmody v. Bd. of Trustees*, 893 F.3d 397, 407–08 (7th Cir. 2018) (*citing EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005)))).

---

[28]    The court obviously takes up the Seventh Circuit's invitation in this regard in this Memorandum Decision.

Even absent these considerations, as the Seventh Circuit has stated, the scope of a trial court's authority on remand is not limited when in consideration of other matters. *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998).

In bankruptcy claims adjudication, where the bankruptcy court has statutory authority to reconsider any claims ruling at any time for cause, 11 U.S.C. § 502(j), and where a party has created a fractured record in the claims litigation before the bankruptcy court as Longo has here, there is unquestionably cause to do more than simply answer the questions asked by the District Court in the Remand. As a result, this court determined that the best course of action on remand was to require Longo to do what he should have done in the first place—amend his claim by attaching the support necessary to make it validly filed under the Bankruptcy Code, the Bankruptcy Rules and the Official Form 410.

That is not to say that the Remand is meaningless. Far from it. Even if this court were not bound by the District Court's rulings in this matter, it would be wholly unwise to ignore them. But the court is bound, as those rulings constitute the law of this case.

As the Supreme Court has stated,

> "[a]s most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." This rule of practice promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues."

*Christianson v. Colt. Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (citations omitted). As this court has previously held, the "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power." *In re Propst*, 637 B.R. 489, 500–01 (Bankr. N.D. Ill. 2022) (Barnes, J.) (*quoting Arizona v. California*, 460 U.S. 605, 619 (*citing Southern Ry. Co. v. Clift,* 260 U.S. 316, 319 (1922); *Messenger v. Anderson,* 225 U.S. 436, 444 (1912)). As the Seventh Circuit has stated, "the 'law of the case' doctrine must yield to rational decisionmaking [sic]." *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir. 1985).

While a court thus, in its discretion, might vary from the law of the case it creates itself, rational decision-making would not result in the court applying its discretion in that way to a decision of a higher court, mandate or no.

In the Remand, the District Court affirmed this court's finding that "the 2017 judgment did not create a secured lien in Longo's favor." *Longo*, 638 B.R. at 603. This determination is the law of the case and is not at issue in this decision. While the amount of the claim attributable to the Fee Award, $615,257.21, is also the law of the case from this court, it was not ruled on by the District Court in the Remand. *Longo*, 638 B.R. at 606 (stating that the District Court "makes no findings on the merits of Longo's claim."). The questions of whether Longo holds either an equitable lien or a lien under the Attorneys Lien Act were not decided by the District Court and thus remain before the court today. Further, the questions surrounding the Smith Claim are before the court anew.

26

With that in mind, the court turns first to the easiest to resolve, Claim No. 7. Following that, the court will consider the claims in order of complexity, taking up Claim No. 5 and finishing with Claim No. 4, the most difficult of the three.

B.    Claim No. 7

As noted above, Claim No. 7 was filed by Longo, ostensibly as an alternative argument for his arguments in Claim No. 4. This is, of course, inappropriate. Not only does it exceed the leave given to Longo under the New Bar Date Order, but, assuming that compliance with this court's orders is optional as it has been treated, it also violates the Bankruptcy Rules.

As to the former, the New Bar Date Order specifically gave Longo leave to amend the Original Claim, not to commence filing new claims for third parties. Other than the leave afforded Longo in the New Bar Date Order, the Bar Date in this Chapter 7 Case had long passed. Claim No. 7 isn't properly before the court for that reason alone.

Further, Claim No. 7 does not comport with the Bankruptcy Rules. Rule 3001(b) of the Federal Rules of Bankruptcy Procedure states that "a proof of claim shall be executed by the creditor or the creditor's authorized agent," with exceptions provided in Bankruptcy Rules 3004 and 3005. As noted above and in earlier decisions, Longo has made clear he is not acting as Smith's attorney with respect to this Chapter 7 Case. *Rosebud Farm*, 619 B.R. at 211 n.5. That fact is made clear in the Smith Reply. Longo withdrew as Smith's attorney on December 12, 2018, when he emailed Smith, stating "the attorney contract between you [Smith] and us [Longo] ended. We can no longer represent you." Smith Reply, Exh. B at p. 1; Restatement (Third) of the Law Governing Lawyers § 31 (2000) ("[w]ithdrawal, whether proper or improper, terminates the lawyer's authority to act for the client."). He was thus only authorized to act on behalf of Smith in this regard if he represented him for that purpose. *Wilson v. Valley Elec. Membership Corp.*, 141 B.R. 309, 313 (E.D. La. 1992). As Longo had no authority to act on Smith's behalf in filing Claim No. 7, Claim No. 7 was not filed in accordance with Bankruptcy Rule 3001(b).

As Bankruptcy Rule 3004 only allows the debtor or trustee to file a proof of claim on behalf of the creditor, Longo could not have been proceeding on that basis in filing Claim No. 7. That leaves Bankruptcy Rule 3005, which allows "any entity *that is or may be liable with the debtor to that creditor, or who has secured that creditor*" to file a proof of claim on behalf of the creditor if the creditor has not timely filed a claim. *See* Fed. R. Bankr. P. 3005 (emphasis added); *see also* 11 U.S.C. § 501(b) and (c) (which allow for third parties co-liable with the debtor or securing the debt of a creditor to file "a proof of such claim" on behalf of the creditor in question, but only, "[i]f a creditor does not timely file a proof of such creditor's claim."). But Smith had indeed filed a claim, Claim No. 5, more than three years before Longo filed Claim No. 7.

Neither Bankruptcy Rules 3004 or 3005 nor section 501(b) should be read to say that a third party is entitled to file a claim for a creditor who has itself filed a claim, even if that claim is not timely. *In re Lorax Corp.*, 307 B.R. 560, 567 (Bankr. N.D. Tex. 2004) (observing that the purpose of Bankruptcy Rules 3004 and 3005 is to entitle "a nonfiling creditor to participate in the estate or under the plan in any chapter."); 9 L. King, COLLIER ON BANKRUPTCY, ¶ 3005.01 at 3005–2 (15th rev. ed. 1998). The "timely" condition acts simply as a limitation that prevents such third parties from acting prematurely, filing claims before one knows if the creditor is going to act. Here, Smith filed Claim No. 5 on September 19, 2019, more than three years before Longo filed Claim No. 7

purportedly on his behalf.  Both claims arise out of the July 14, 2017, judgment, and are, apart from the claim for post-judgment work that Longo added to Claim No. 7, duplicative.

Further, Bankruptcy Rule 3005 and section 501(b) each set specific conditions on which a creditor may act other than simply the bar date having passed and no claim having been filed.  A party must "be liable with the debtor to that creditor, or [be a party] who has secured that creditor." Fed. R. Bankr. P. 3005; 11 U.S.C. § 501(b); *In re DeMert & Dougherty, Inc.*, 227 B.R. 508, 513 (Bankr. N.D. Ill. 1998) (Squires, J.) (finding a claim to be unmeritorious where the claimant "simply does not fit within the class of parties who are afforded protection under Bankruptcy Rule 3005(a).").  Here, Longo has offered nothing to show that he meets either condition.  *In re Lewis*, 637 B.R. 861, 877 (Bankr. W.D. Ark. 2022) (observing that it is the obligation of the codebtor to include sufficient information with the claim to establish a right to file and execute the proof of claim) (*citing* 4 COLLIER ON BANKRUPTCY ¶ 501.03[1] (16th ed. 2019)).[29]

Finally, it is worth pointing out that this is not the way to object to or weigh in on a filed claim.  *DeMert*, 227 B.R. at 514 (rejecting a claim under Bankruptcy Rule 3005 as a "thinly veiled attempt to bootstrap possible claims" for the claimant's own benefit).  Nor is it possible for one creditor to amend another's as Longo states in Claim No. 7.  The New Bar Date Order was limited to the Original Claim, with objections to be set later by the New Briefing Deadlines Order.  Nothing Longo argues in Claim No. 7 is not already covered in Claim No. 4 or the related briefing.  Claim No. 7 served simply as a distraction, delaying this court's adjudication of the matters properly before it and diverting the resources of the other parties' legitimate claims unnecessarily.

C.   Claim No. 5

In the Trustee Claim No. 5 Objection, the Trustee raises three objections to which Smith does not respond.  Even in the absence of that response and accepting the factual allegations made by the Trustee as true, the determination of the Smith Claim is not entirely uncontroversial.  The conclusions below are made without reference to Longo's rights, which will be taken up in the context of Claim No. 4.  That discussion will alter the outcomes below in the manner discussed at that point.

1.   *Smith Has an Allowed Secured Claim in the Amount of the Judgment*

Smith filed Claim No. 5 as a secured claim in the amount of $590,131.02 on September 18, 2019.  The filed claim appears on its face to meet the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Official Forms.  Attached to Claim No. 5 is the Recorded Judgment, which as noted above, gave rise to a secured lien in favor of Smith in the amount of the Judgment in the Debtor's real property.  *Rosebud Farm*, 619 B.R. at 210; *cf.* 28 U.S.C. § 3201.  The amount of the Judgment was $559,656.57.

---

[29]   *Lewis* also stands for the proposition that improperly filing a claim on behalf of another is a sanctionable act under both Civil Rule 11 and Bankruptcy Rule 9011.  *Lewis*, 637 B.R. at 877.  No party has raised that concern here and the court will not consider it *sua sponte*.

2.      *Actual vs. Punitive Damages*

The Trustee argues that Claim No. 5, as asserted, does not account for the fact that a portion of the Judgment is for punitive damages.  The Bankruptcy Code requires that distributions on account of punitive damages claims, whether secured or unsecured, be subordinated to payment of all other creditors.  11 U.S.C. § 726(a)(4).  Section 726(a)(4), in pertinent part, provides for a fourth level of distributions for "any allowed claim, whether secured or unsecured, for … punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such … damages are not compensation for actual pecuniary loss suffered by the holder of such claim."  *Id.*

The Trustee is correct.  A brief examination of the Judgment reveals that it consists of two categories of awards from the Debtor to Smith, as follows: (a) Actual Damages in the amount of $279,656.57; and (b) Punitive Damages in the amount of $280,000.00.  Judgment in a Civil Case [Prepetition Action, Dkt. No. 339].

The Trustee is incorrect, however, in concluding that the Punitive Damages portion is unsecured.  While it is true that the Trustee could seek avoidance of the same, 11 U.S.C. § 724(a), he has not done so.  Section 724(a) states that "the trustee may avoid a lien that secures a claim of a kind specified in section 726(a)(4) of this title."  *Id.*

Section 726(a)(4) is a rule of distribution that is self-effectuating.  There need be no adversary or other contested proceeding in order for it to apply.  *Murphy v. Felice (In re Felice)*, 480 B.R. 401, 418 (Bankr. D. Mass. 2012) ("The trustee may distribute this property pursuant to § 726(a) without order from any court.").  Nothing in section 726(a)(4), however, changes the underlying nature of the claim.  For that, the trustee must use section 724(a).

Section 724(a) requires an adversary proceeding.  It uses the same phrasing as section 522(f), which allows a debtor to avoid judicial liens.  It is very clear from the Bankruptcy Rules that section 522(f) avoidance would require an adversary proceeding, but for the exceptions in the Bankruptcy Rules.  Bankruptcy Rule 7001(2) makes clear that an adversary is required for a determination of the validity, priority, or extent of a lien.  Fed. R. Bankr. P. 7001(2).  The Judicial Conference, however, expressly excluded section 522(f) avoidance from the scope of Bankruptcy Rule 7001(2) by referencing Bankruptcy Rule 4003(d), the rule governing such avoidance actions. No such exception is made for section 724(a), despite the parallel language in the Bankruptcy Code sections.  As a result, even were the Trustee seeking such avoidance through Trustee Claim No. 5 Objection, he may not do so.  An adversary is required under Bankruptcy Rule 7001(2) and the Trustee is prohibited from including such relief in his claims objection.  Fed. R. Bankr. P. 3007(b).

While the Smith Claim will require bifurcation into Actual Damages and Punitive Damages for distribution purposes, both portions are secured and are entitled to treatment as such prior to that point.

3.      *The Kingdom Farms Payments*

The Trustee argues that the amount of Claim No. 5 is overstated because it fails to account for the Kingdom Farms payments—$55,000.00 in turned over lease payments credited to the Judgment before the Petition Date.

In his Proof of Claim, Smith acknowledges that such a pre-petition judgment payment would reduce the amount of the judgment.  Claim No. 5, at p. 4.  The payments are alleged with a lack of specificity, however.  The timing of the payments affects calculation of interest, which is calculated daily.  28 U.S.C. § 1961.  Though no party challenges the existence and effect of the Kingdom Farms payments, no party provides the facts of such payments with the specificity necessary to perform accurate interest calculations.  For that reason, the court has examined the docket of the Prepetition Action and made modest assumptions regarding the timing of the same.  The parties have also given the court little or no direction as to what components of the Smith Claim should be reduced and whether Longo received his 45% of those payments.[30]

In the absence of such guidance, the court has considered the applicable case law.  It appears that federal courts considering the allocation of payments on judgments apply what is called the "United States rule."  As the Third Circuit has written:

> The United States rule, which provides that payments be applied first to accrued interest and then to principal, has been followed by the federal courts for almost a century and a half.  *See, e.g., Story v. Livingston,* 38 U.S. (13 Pet.) 359, 371, 10 L.Ed. 200 (1839); *Whiteside v. Washington Loan & Trust Co.,* 95 F.2d 83, 87 (D.C.Cir.1937); *Gamble v. Wimberly,* 44 F.2d 329, 331 (4th Cir.1930); *Ohio Savings Bank & Trust Co. v. Willys Corp.,* 8 F.2d 463, 466-68 (2d Cir.1925); *Torosian v. National Capital Bank of Washington,* 411 F. Supp. 167, 172-75 (D.D.C.1976).

*Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020, 1025 n.6 (3d Cir. 1984) (applying the United States rule to allocation under section 1961); *see also Sakamoto v. Walkup*, 762 F.2d 1011 (6th Cir. 1985).

As the Seventh Circuit has written, "[t]he rule that payment is first applied to accrued interest 'applies in the absence of "a clearly expressed intention" by the parties to allocate payments in some other way,' and it 'does not permit the debtor unilaterally to allocate payments to principal rather than interest.'  Because the parties did not specify otherwise in this case, the Rule would appear to apply."  *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 604 (7th Cir. 2008) (citation omitted).

Thus, the United States rule applies here and the Kingdom Farms payments must be allocated first to the accrued interest on the Judgment as a whole.

As to the allocation between the Actual Damages and the Punitive Damages, the court disagrees with the Trustee's suggestion that the payments should be applied first to Actual Damages.  The District Court could have specified how the Kingdom Farms payments must be allocated, *see, e.g.*, *Cline v. Sunoco Partners Mktg. & Terminals L.P.*, Case No. 20-7064, 2021 WL 5858399, at *1 (10th Cir. Nov. 1, 2021), but it did not.  Not knowing that a bankruptcy case was in the Debtor's future, it had little reason to.  In other contexts, courts have held that it is the responsibility of the party seeking specific allocation of settlement payments to the detriment of others who bears the burden of demonstrating that such was the parties' intent or an express requirement of the settlement. *Pedernales Elec. Coop., Inc. v. Hartford Cas. Ins. Co.*, A-11-CA-446-SS, 2012 WL 13033969, at *3 (W.D.

---

[30]    The court once again reminds the parties that the incompleteness of their arguments contributes to delay.

Tex. July 10, 2012) (allowing nonsettling defendant to argue that settling defendants' payments should be allocated to damages on which the defendants were jointly liable).

Here, it benefits Smith and Longo most to have the Kingdom Farms payments allocated to the subordinated part of the Judgment, the Punitive Damages. True, section 726(a) might require payments be made to the higher-priority portion of the claim should the payments have occurred within the Chapter 7 Case, but they did not occur then. These payments were made outside of the context of bankruptcy. As a result, Smith and Longo are under no obligation to follow the priorities set forth in section 726(a) in arguing that the payments should be applied first to the Punitive Damages. *Accord In re All. Health of Ft. Worth, Inc.*, 240 B.R. 699, 705 (N.D. Tex. 1999), *aff'd sub nom. In re All. Health of Fort Worth Inc.*, 200 F.3d 816 (5th Cir. 1999) ("The right to set-off is not affected by the debtor's bankruptcy, 11 U.S.C. § 553; accordingly, the provisions regarding subordination of claims do not apply.") (holding that the IRS was free to set off against a Medicare underpayment against subordinated penalty claims).

As it benefits Smith the most to have the Kingdom Farms payments credited against the Punitive Damages, as section 726 does not guide the analysis and as the Trustee has shown no intent of the parties to do otherwise, to the extent that the Kingdom Farms payments are to be applied to principal (see discussion of prepetition interest below), the court applies the Kingdom Farms payments to reduce the principal balance of the Punitive Damages.

4. *Prepetition Interest on the Judgment Is Allowed at the Federal Rate of Interest*

Both Smith and Longo assert that the Judgment should have accrued prepetition interest. Though Longo does not specify the interest rate, Smith incorrectly asserts that the Judgment was entitled to prepetition interest at a rate of 2.5%. Claim No. 5.

The parties are correct that the Judgment would have accrued interest up to the Petition Date. The Judgment arises out of the Prepetition Action, a civil case in the District Court. Section 1961 states, in pertinent part, that

> [i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. …. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

28 U.S.C. § 1961(a). "Interest shall be computed daily to the date of payment … and shall be compounded annually." 28 U.S.C. § 1961(b). Under Illinois law, post-judgment interest is secured as the Judgment is secured. *Cf. Barrett*, 165 Ill. App. at 98.

However, the Trustee is also correct that the applicable rate of interest is lower, in this case 1.23%. 28 U.S.C. § 1961(a). The court determined the correct rate of interest by following the guidance given to the public by the United States courts.[31]

Thus, not accounting for reductions in the Judgment balance for payments, interest on the Judgment would have accrued daily at 1.23% in the manner set forth in section 1961(a) from July 14, 2017, to the Petition Date, August 31, 2018. That prepetition interest has been calculated in Table A, attached. In addition to accruing, compounding and applying the interest, Table A also applies the Kingdom Farms payments. As noted above, the Kingdom Farms payments are applied first to all accrued, unpaid and uncompounded interest, and thereafter to the principal balance of the Punitive Damages portion of the Judgment.

As found above, this results in prepetition Actual Damages in the amount of $279,770.66 and Punitive Damages in the amount of $232,477.86.[32] These are thus the allowed amounts of Claim No. 5's claims under the Judgment.

     5.     *Postpetition Interest on the Judgment Is Allowed at the Federal Rate of Interest*

The applicable interest rate for postpetition judgment interest is the same as for prepetition judgment interest. 28 U.S.C. § 1961; *In re Levitsky*, 137 B.R. 288, 292 (Bankr. E.D. Wis. 1992).

Ordinarily, the Smith Claim would not accrue interest after the Petition Date. 11 U.S.C. § 502(b)(2). However, as the Smith Claim is secured, the court must consider the effect of section 506. 11 U.S.C. § 506(b). Under section 506(b),

> [t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

Here, the net proceeds of the sale of the Debtor's real property, the property in which the Judgment is secured, was $670,855.79. That exceeds the allowable amount of the Judgment Claim of $512, 248.52 (Actual Damages of $279,770.66 plus Punitive Damages of $232,477.86, as set forth above). Because there are no other competing secured claims, as a result, the Judgment is entitled to postpetition interest. That interest would apply to both parts of the Judgment claim, irrespective of

---

[31]     United States Courts, https://www.uscourts.gov/services-forms/fees/post-judgment-interest-rate [last visited April 27, 2024]. Once again, the court reminds that parties that mere allegations of the correct interest rate without factual support are incomplete arguments, which lead to delay.

[32]     Whether or not Longo received 45% percent of the Kingdom Farms payments is a private matter between Longo and Smith. For distribution purposes, discussed in detail below, the court presumes that Longo received his Percentage Recovery on those funds and thus will credit the payments against the Judgment ratably.

the subordination of the Punitive Damages claim under section 724. It all remains secured and thus is all entitled to accrue interest.

The court has calculated the postpetition interest from the Petition Date, August 31, 2018, through the date of this Memorandum Decision. That interest totals: $18,362.16 for the Actual Damages and $18,384.71 for the Punitive Damages. While the Actual Damages interest would be payable as a part of the Smith Claim under section 725, the interest on the Punitive Damages would be subordinated along with the principal of the Punitive Damages under section 726(a)(4).

6. *The Fee Award*

Though not asserted by Smith, there is clearly one additional claim that Smith nominally possesses, the Fee Award.

As noted above, the District Court awarded the attorneys' fees and costs to Smith, not Longo. *See* Fee Award at p. 38 ("[T]he Court awards Plaintiff $ 611,388.50 in attorney's fees and $ 3,868.71 in costs …."). This is consistent with the statute under which the fees had been sought. *See* 42 U.S.C. § 2000e-5(k) (providing that the prevailing *party* may be allowed attorney's fees). Nothing in the Fee Award or the statute gives rise to a direct right to payment for the attorney. *Accord Zeisler v. Neese*, 24 F.3d 1000, 1001 (7th Cir. 1994) (making clear under analogous provision in the Truth and Lending Act that the fees belong to the plaintiff, not the lawyer).

However, it is clear from the Assignment that this claim has been assigned to Longo. The Assignment states that Smith "assigns to [Longo] all claims for attorneys' fees arising from or relating to any and all claims that [Smith] has or may have against [the Debtor] …. [Smith] assigns the collection of all attorney's fees to [Longo] and the right to those attorneys' fees." Claim No. 4-9, Exh. A. Substantially similar language exists in the Attorney/Client Agreement. It states that "[y]ou assign to us all claims for attorneys' fees arising out of your claims." Attorney/Client Agreement, ¶ 9. As *Zeisler* points out, this is one way an attorney can protect her interests. *Zeisler*, 24 F.3d at 1002.

Under Illinois law,

> [a]n assignment operates to transfer some identifiable property right, interest, or claim from the assignor to assignee. *Department of Transportation v. Heritage-Pullman Bank & Trust Co.*, 254 Ill. App. 3d 823, 826, 194 Ill. Dec. 75, 627 N.E.2d 191 (1993). "Generally, no particular form of assignment is required; any document which sufficiently evidences the intent of the assignor to vest ownership of the subject matter of the assignment in the assignee is sufficient to effect an assignment." (Internal quotation marks omitted.) *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 100, 325 Ill. Dec. 483, 898 N.E.2d 216 (2008). "A valid assignment needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification." (Internal quotation marks omitted.) *Id.* "Whether an assignment has occurred is dependent upon proof of intent to make an assignment and that intent must be manifested." (Internal quotation marks omitted.) *Id.* Furthermore, "an assignment shall not be effective towards the obligor or a third party unless accepted

by the obligor or notified to him." (Internal quotation marks omitted.)  *Overseas Development Disc Corp. v. Sangamo Construction Co.*, 686 F.2d 498, 504 (7th Cir. 1982). Assignments are "subject to the same requisites for validity as are other contracts, such as intent, mutuality of assent, capacity to contract, legal subject matter, and consideration." (Internal quotation marks omitted.)  *American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d at 100, 325 Ill. Dec. 483, 898 N.E.2d 216.

*In re Cnty. Treasurer & ex officio Cnty. Collector of Cook Cnty.*, 2023 Ill. App (1st) 220070, ¶ 32, *appeal denied sub nom. In re Cnty. Treasurer*, 223 N.E.3d 624 (Ill. 2023).  The court's review of the Assignment is that it is a valid assignment under these considerations and would be enforceable under Illinois law.

Smith has not challenged the validity of the Assignment.  Nor does it appear that he could have, had he wanted to.  The language of the Assignment is unequivocal.  It is clear then that, pursuant to the Assignment, the Fee Award is Longo's to collect and he, not Smith, is the proper claimant on the Fee Award.  Thus, Smith may not assert a claim for the Fee Award, Longo may.  By the same token, though the Post-Judgment Fees are also Smith's to assert in the first instance, the court reads the Assignment as assigning the right to pursue those fees to Longo as well.

As a result, the court will take up the Fee Award and the Post-Judgment Fees when considering the validity of Claim No. 4.

D.      Claim No. 4

In taking up Claim No. 4, the court must consider the law of the case as it relates to the Original Claim and the Original Decision and the effect of the Remand and its effect on the issues at bar.  Following that, as the District Court suggested, the court will address whether or not Longo may claim a lien in any of the proceeds designated for Smith.  The court will then take up the new issues presented by Claim No. 4 and the Objections and briefing relating thereto and the intersection of Claim No. 4 and Claim No. 5 in light of the new evidence presented by Longo.  The court will consider each issue in turn.

1.      *The Original Claim, the Original Decision and the Law of the Case*

Longo's Original Claim consisted of four separate amounts.

First, Longo claimed the $1,392,490.00 and agreed costs of $3,868.71 that he requested from the District Court, rather than the $615,257.21 Fee Award awarded by the District Court.  Longo claimed the amount he requested because he intended to appeal the District Court's decision at the hourly rate he requested, not that allowed by the District Court.  Second, Longo claimed a percentage of the underlying Judgment per an undisclosed attorney/client agreement.  Third, Longo claimed interest as allowed by law.  Fourth and finally, Longo claimed $383,900.00 in "fees and costs since the last fee petition was filed in the District Court until 1/29/19."

The question then becomes, were any of these issues finally determined by the court in the Original Decision and, even if some were, is there a reason to reconsider them now?  The court will consider each of the four issues in turn.

a.     *The Fee Award*

In ruling on the Original Claim, the court found that Longo was limited to the Fee Award and not what he might have intended to assert on appeal.  As the court stated then:

> Longo has failed to meet his burden to establish that the Claim should be allowed in an amount greater than the Fee Award.  The District Court in the Prepetition Action already considered the same arguments and evidence presented by Longo now and determined that Longo was entitled to fees and costs totaling $615,257.21.  *See* Fee Award, at pp. 1–3.  The matter has, therefore, already been litigated and finally determined by the District Court in the Prepetition Action.  The District Court conducted an extensive, detailed analysis using essentially the same approach as the court would take were it to examine Longo's fees in the first instance.  *See id.* at pp. 3–30.  The District Court examined in detail the hourly rate Longo charged, *id.* at pp. 5–11 (determining that the requested rate of $550.00 per hour was unreasonable and reducing the rate to $360.00 per hour), and then considered in even greater detail the number of hours billed.  *Id.* at pp. 11–28 (reducing the hours on account of excessive or improper filings, clerical or administrative tasks billed by an attorney, block billing and overly vague time entries and excessive or redundant tasks).  There is no reason, based on the Fee Award itself and the evidence submitted by Longo in support of the Claim, to question the soundness or accuracy of the analysis set forth in the Fee Award.

*Rosebud Farm,* 619 B.R. at 214.  Longo did not appeal this aspect of the Original Decision.  *See* Notice of Appeal and, if Necessary, Motion for Leave to Appeal [Dkt. No. 160].  As a result, the District Court therefore correctly refrained from ruling on the amount of Longo's claim.  *Longo*, 638 B.R. at 606 (stating that the District Court "makes no findings on the merits of Longo's claim.").

There is little question that the Original Decision was a final order.  As noted above, an objection to a claim is a contested matter.  Fed. R. Bankr. P. 9014 Advisory Committee's notes to 1983 adoption (""[T]he filing of an objection to a proof of claim … creates a dispute which is a contested matter."); *In re Mouzon Enterprises, Inc.*, 610 F.3d 1329, 1333 (11th Cir. 2010) ("[T]he filing of an objection to a proof of claim gives rise to a contested matter."); *Spiegel*, 657 B.R. at 51; *see also* Fed R. Bankr. P. 3007 Advisory Committee notes to 1983 adoption.

The court's order disposing of the Original Objection was thus the equivalent of the judgment.  Fed. R. Bankr. P. 9021.  All elements of that order were thus appealable.  Longo could have appealed this court's ruling regarding the Fee Order, but chose not to.  As a result, any challenge to the court's treatment of the Fee Order claim in the Original Decision would ordinarily be forfeited.  *United States v. Funds in the Amount of One Hundred Thousand and One Hundred Twenty Dollars*, 901 F.3d 758, 767 n.5 (7th Cir. 2018) ("Regardless of nomenclature ... if an issue was decided by the district court but was not appealed, the issue is forfeited, and the district court may not reconsider the issue on remand.") (quoting *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 835 n.3 (5th Cir. 2011)).

Still, while this ruling is now the law of the case, the law of the case yields to rational decision-making.  *Peterson*, 765 F.2d at 704.  Further, the Bankruptcy Code affords this court leave to reconsider its claims rulings for cause at any point in the bankruptcy case.  11 U.S.C. § 502(j) ("A

claim that has been allowed or disallowed may be reconsidered for cause.").  Interestingly, the grant of authority under section 502(j) is one of the few times that the bankruptcy court is granted the actual equitable authority that most courts mistakenly believe is inherently in the court's power otherwise.  *Id.* ("A reconsidered claim may be allowed or disallowed according to the equities of the case.").  As the Eighth Circuit has stated, "[t]he court's broad remedial powers extend to deciding the procedure necessary to invoke them; the court need not wait for a formal motion and may reconsider a claim *sua sponte.*"  *In re Kirwan*, 164 F.3d 1175, 1177 (8th Cir. 1999).

It should also be noted that the court has the power to estimate claims.  Section 502 of the Bankruptcy Code states that "[t]here shall be estimated for purpose of allowance under this section … any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c)(1).  As the Seventh Circuit has stated with respect to section 502(c), "any judge must be able to recognize the point of diminishing returns and act accordingly—as the bankruptcy judge did here.  *Midway Motor Lodge*, 54 F.3d at 409.[33]

With respect to estimation, Judge Lynch has stated that,

> [n]either the Bankruptcy Code nor the Bankruptcy Rules set forth a clear standard for estimating a contingent or unliquidated claim.  "[C]ourts have wide discretion in determining the method by which to estimate contingent or unliquidated claims." *In re Kreisler*, 407 B.R. 321, 328 (Bankr. N.D. Ill. 2009); *see also In re Benanti*, No. 15-71018, 2018 WL 1801194, at *10 (Bankr. C.D. Ill. Apr. 13, 2018).  If there is a general rule, it is that courts "should use whatever method is best suited to the particular circumstances at issue." *Kreisler*, 407 B.R. at 329 (*citing Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356 (3d Cir. 2002)).

*In re Neely*, 608 B.R. 806, 824 (Bankr. N.D. Ill. 2019) (Lynch, J.).

Here both rational decision-making, the equities of the case and the court's powers to estimate claims all beg the question as to what purpose would be served with a higher fee award.  It should be noted that, other than Smith and Longo, there appears to be only *one* other claim to be paid by the Trustee.  *See* Claim No. 3 of Howard B. Samuels, Chapter 7 Trustee for Central Grocers, Inc. ("Claim No. 3").  Claim No. 3 is in the amount of $25,426.60 and, other than Claim No. 4, is the only unsecured claim in the Chapter 7 Case which has not been disallowed.  As a result, Claim No. 3 will be paid ratably with Claim No. 4, before the Punitive Damages.  As discussed in the distribution discussion below, as Claim No. 4 so outweighs Claim No. 3, increasing Claim No. 4 does virtually nothing to either claim's recovery.  What remains then is a dispute between a lawyer and his client, based mostly on their agreements with each other and not on claims against the estate.  As discussed below, with only slight variations, based on the assets of the estate as the court

---

[33]  In *Midway Motor Lodge*, the Seventh Circuit found it unproblematic that the bankruptcy court converted an estimation proceeding to one on the merits.  *Id.* at 408-09.  If those actions are not incompatible, it would be equally unproblematic for the court to use its estimation powers to estimate a claim submitted to it for a decision on the merits if such decision, per the express terms of section 502(c), would unduly delay the administration of the estate.  As the Seventh Circuit stated, "even if the bankruptcy court had not said a word about addressing [the] objection to [the] claim, the court could have done so once it had heard enough to recognize that the claim had to fail." *Id.* at 409.

understands them, *see* Individual Estate Property Record and Report of Asset Cases [Dkt. No. 235], on June 30, 2022, there existed $684,755.11 in liquid estate assets.[34]   Further, the continued litigation on these issues has resulted in the available assets diminishing over time from bank account fees and other trustee expenses.  As the claims stand, Longo will receive the majority of those assets.  The only purpose of further claims litigation is to deprive his former client of recovery for Longo's benefit.

As noted above, claims litigation in bankruptcy is about what portion of the estate assets a party is entitled to.  *Spiegel*, 657 B.R. at 51.  It is not about replicating merits litigation that might occur outside of bankruptcy.  *Id.*

This court has long held that claims litigation serves no purpose in assetless chapter 7 cases. *In re Mendiola*, 99 B.R. 864, 866–68 (Bankr. N.D. Ill. 1989) (it is unnecessary to file proof of claims in a "no asset" chapter 7 case); *see also Stolfo v. KinderCare Learning Centers, LLC*, 727 Fed. Appx. 861, 865 (7th Cir. 2018); Fed. R. Bankr. P. 2002(e); a*ccord Kiger*, 417 F.2d at 1196 ("It is axiomatic that this Court will not engage in an exercise in futility.").  The point is that no bankruptcy purpose can be served by litigation that will not affect an outcome.  *Accord In re Mesa Bus. Park P'ship*, 127 B.R. 144, 147 (Bankr. W.D. Tex. 1991) (no purpose is served by a valuation proceeding in a bankruptcy case where there is no reason to determine the unsecured claim of a lender); *In re Richardson,* 97 B.R. 161, 162 (Bankr. W.D.N.Y. 1989).  Finally, the court's constitutional authority to even hear and determine a matter is in question when the result will not affect the bankruptcy estate.  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1996); *accord Bush v. United States*, Case No. 16-3244, 2024 WL 1854093 (7th Cir. April 29, 2024) (clarifying that in such circumstances, a court may have jurisdiction but may not have constitutional authority).

As a result, the court simply cannot see a reason to reconsider the Original Decision in this regard.  Rational decision-making does not lead the court to a different result.  Nor does it establish cause to reconsider the claim.  11 U.S.C. § 502(j).

As a result, but for the interest question discussed below, the court declines to exercise its discretion and reconsider the law of the case relating to the Fee Award.

> b.  *The Percentage Recovery*

Second, Longo claimed a percentage of the underlying Judgment per an undisclosed attorney/client agreement.  The court stated then that "Longo has not demonstrated the existence and terms of the attorney-client relationship between him and Smith."  *Rosebud Farm*, 619 B.R. at 212.  What necessitated that conclusion was Longo's failure to amend the Original Claim as instructed and attach any such agreement.  While the District Court was presented new evidence on

---

[34]      The court recognizes that this information is dated and the number, given ongoing account costs and other administrative expense, is unquestionably lower.  The court's efforts to obtain a more recent accounting have been thwarted and it is not worth delaying this Memorandum Decision further for those numbers.  The numbers as they existed then are sufficient to illustrate the futility of adding any further amounts to Longo's unsecured claim, as discussed below.

appeal that it decided was worth considering, this does not change the fact that Longo failed to follow court instructions and the Original Claim failed as a result.[35]

As a result, the court could not then determine the propriety of the Percentage Recovery. It can now. Given that Longo has now provided the court with the Attorney/Client Agreement, there is cause to reconsider the court's earlier disallowance of this portion of his claim and the court will do so below, considering the equities of the case. 11U.S.C. § 502(j).

     c.    *Interest*

As the court, in the Original Decision, found that Longo had no claim against the estate, any determination of interest was moot. As a result, the court did not take up the question of interest in the Original Decision. There is cause to do so now and the court will do so below, considering the equities of the case. 11 U.S.C. § 502(j).

     d.    *Post-Judgment Fees*

Longo's request for Post-Judgment Fees was considered in light of the court's overall conclusion on the Fee Award and whether Longo possessed a secured claim against the Debtor's bankruptcy estate. The court's ruling is better informed by the existence of the Assignment, which allows Longo to stand in the shoes of Smith in asserting such fees.

In light of the Remand and the court's determinations on the other issues at bar, there is cause to reconsider whether Longo, standing in the shoes of Smith under the Assignment, has a right to assert the Post-Judgment Fees and will do so below, considering the equities of the case. 11 U.S.C. § 502(j).

    2.    *The Remand*

Longo specifically appealed this court's conclusion that the Recorded Judgment did not secure attorneys' fees, that he had failed to produce evidence to support his claim of an attorneys' lien and that he had failed to serve the Debtor with notice of his claimed attorneys' lien, despite his failure to properly provide of the same in the claims docket of the case. Appellant's Statement of Issue on Appeal [Dkt. No. 168].

In the Remand, the District Court affirmed this court's finding that the 2017 Judgment award did not create a secured lien in Longo's favor, and remanded (1) the question of whether Longo had a lien under the Attorneys Lien Act; and (2) the question of whether Longo's agreement with Smith created an equitable lien, an unsecured lien, or any lien at all.

For the issue of the Attorneys Lien Act, the District Court suggested that this court consider Longo's Affidavit along with the evidence Longo submitted to the District Court, namely (1) the

---

[35] The Remand, unfortunately, sets horrible precedent. While the District Court is correct that this court gave short shrift to the self-serving "affidavit" filed by Longo, it failed to respect the fact that what little evidence Longo did present was presented in a manner that violated the court's instructions. Parties should not expect that the District Court will ignore this court's authority over the process in future matters and should be advised to not do as Longo did in this Chapter 7 Case, even though Longo is now getting a second chance after so doing.

Attorney/Client Agreement; and (2) evidence that Longo served Rosebud by certified mail with the notice of attorney's lien and other documents.  The District Court also suggested that this court "consider whatever other evidence it deems appropriate to consider on the issue of whether Longo perfected a lien pursuant to the Attorneys Lien Act and the priority of that lien for purposes of administering Rosebud's estate." *Longo*, 638 B.R. at 605.

As a point of law, the District Court recommended that this court "apply the relevant distinction set forth by the Seventh Circuit … between a 'promise to pay' and 'an actual assignment.'" *In re Brass Kettle Rest., Inc.*, 790 F.2d 574, 576 (7th Cir. 1986) (*quoting McKee-Berger-Mansueto, Inc. v. Board of Ed.*, 691 F.2d 828, 836 (7th Cir.1982)).  While the court had no cause to take up these issues before, it will do so below considering the issues now also taken up below and, in so doing, will take into account the cases noted by the District Court.

  3.  *Liens, Attorney's Liens and Equitable Liens*

In *Del Grosso*, Judge Squires of this court took up the question of how an attorney might secure her compensation.  *In re Del Grosso*, 111 B.R. 178 (Bankr. N.D. Ill. 1990) (Squires, J.).  There the court observed that there are four methods:  Possessory liens, the Attorneys Lien Act, equitable liens or under the Uniform Commercial Code.  *Id.* at 181.

Here, Longo has offered argument on the Attorneys Lien Act and with respect to equitable liens.  The court will consider each, in turn.  First, however, the court's authority over this determination needs revising.

  a.  *Constitutional Authority to Hear and Determine Issues Between Smith and Longo*

As noted at the outset, the Supreme Court has made clear that even where a bankruptcy judge has statutory authority over a matter, the exercise of the authority may be unconstitutional.  *Stern,* 564 U.S. at 503.  In *Stern*, the Court found that the bankruptcy judge had overreached in hearing an estate's counterclaim against a claimant as such matters are plenary in nature, are private rights disputes and do not affect the bankruptcy directly, only indirectly insofar as success in the matter might increase assets of the estate.  *Id.* at 499.

The disputes between Smith and Longo are mostly of the kind that falls outside of this court's constitutional authority.  True, the Objections seek a determination by the court whether a claim should be allowed or disallowed pursuant to section 502 of the Bankruptcy Code.  11 U.S.C. § 502.  That makes this a contested matter, concerning the allowance or disallowance of a claim against the bankruptcy estate, which is expressly a core proceeding.  28 U.S.C. § 157(b)(2)(B).  Further, distributions under sections 724 and 726 are clearly matters of the court's core authority. 28 U.S.C. §§ 157(b)(2)(A) & (O).

While it would be impossible to determine the Trustee's obligations under sections 724 and 726 without resolving the issues between Smith and Longo, intercreditor disputes are matters concerning the private rights of those other than a debtor, the debtor's property or the bankruptcy estate and generally fall outside this court's constitutional authority.

One district court has taken up the question of whether the bankruptcy court's authority over distributions in a case was sufficient to give it constitutional authority to hear and determine a charging lien claim.  *Keefe, Anchors & Gordon PA v. ASI Holding Co., Inc.*, 598 B.R. 20 (N.D. Fla.

2018).  In *Keefe*, the court found that such a determination was outside of the bankruptcy court's authority to hear summary, public rights matters as it was a creditor versus creditor dispute.  *Id.* at 25–26.  Still, that determination was made in the limited context of post confirmation plan distributions and the district court made clear that its decision might have been different if the determination may have had a "conceivable effect on the debtor, other creditors, or the administration of the bankruptcy estate." *Id.* at 27.  *Keefe* has been followed by at least one other district court in affirming the bankruptcy court's refusal to hear charging lien issues.  *W. 57th St. Concrete Corp.*, Case No. 96 CIV. 3854, 1996 WL 706931 (S.D.N.Y. Dec. 9, 1996).[36]

Here, other than as determined herein, the dispute between Longo and Smith will have no effect on the bankruptcy estate other than delay its conclusion.  This is primarily because Longo's claims to an attorney's lien or an equitable lien are not claims against the bankruptcy estate.  It is also because the outcome of these disputes only affects the relative distributions between Longo and Smith.

<em>i.     Attorneys and Equitable Liens Are Not Claims Against the Estate</em>

What Longo is claiming here is either an attorneys' lien or an equitable lien.  Neither is it a claim under the definitions of section 502.  They are liens in Smith's recoveries, not liens in property of the estate or a claim against the estate.  As the Seventh Circuit has stated (applying Illinois law),

> [a]lthough a charging lien also secures an attorney's right to compensation, it attaches only to the proceeds that the client might recover in pursuit of a claim for which the attorney was engaged to represent the client. *See Twin Sewer & Water,* 242 Ill. Dec. 15, 720 N.E.2d at 639–40; *Upgrade,* 43 Ill. Dec. 159, 410 N.E.2d at 161. This is this type of lien that the Illinois Attorneys' Lien Act recognizes and regulates. *Twin Sewer & Water,* 242 Ill. Dec. 15, 720 N.E.2d at 639–40.  Although the charging lien has the advantage of being an "active" lien *that an attorney may take affirmative steps to enforce against his client, see id.,* its utility depends on the client succeeding on his underlying claim for relief.

*Johnson v. Cherry*, 422 F.3d 540, 554 (7th Cir. 2005) (emphasis added).  Any such lien "attaches to any money or property recovered in the matter upon the disposition of the claim," *Kovitz Shifrin Nesbit, P.C. v. Rossiello,* 392 Ill. App.3d 1059, 1064 (Ill. App. Ct. 2009), and does not confer "an absolute right to immediate possession of the claimed funds." *Id.* at 1065.  Without an enforceable right against the property of the Debtor on the Petition Date, Longo has no claim against the estate.

---

[36]     The bounds of what a bankruptcy court can exercise jurisdiction over when it affects the estate's distributions has been tested outside the concept of charging liens but has not given rise to any clear cut standard of determination.  The Fifth Circuit, for example, stated that a chapter 7 trustee could not be ordered to comply with an intercreditor agreement in making distributions that, even though recorded, did not rise to the level of a legal assignment.  *In re El Paso Refinery*, 171 F.3d 249 (5th Cir. 1999).  Closer to home, Judge Wedoff allowed a bankruptcy plan to distribute in accordance with subordination agreements between creditors, but he did so prior to *Stern* and under the auspices of section 510(a), which provides that subordination agreements are enforceable in bankruptcy.  *In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 329 (Bankr. N.D. Ill. 2000) (Wedoff, J.).

If Longo has no such claim, he has no allowable claim. Section 502(b)(1) states that, if an "objection to a claim is made, the court, after notice and a hearing, … shall allow such claim in such amount, except to the extent that—(1) *such claim is unenforceable against the debtor and property of the debtor* …." 11 U.S.C. § 502(b)(1) (emphasis added).

To be clear, claims are measured on the Petition Date. 11 U.S.C. § 502(b) (if an "objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such … *as of the date of the filing of the petition* ….") (emphasis added). On the Petition Date, nonexempt property of the Debtor became property of the bankruptcy estate. 11 U.S.C. § 541. At that time, no property had been earmarked for recovery for Smith and thus Longo could not have had a claim against the estate on the Petition Date, irrespective of whether he had a charging lien. *Kovitz,* 392 Ill. App.3d at 1064-65. Had the Debtor frittered away its assets, Longo would have had no recourse. The assets were the Debtor's and the Debtor's alone. As the court in *Kovitz* explained, even "a perfected [charging] lien does not confer a guaranteed right to the claimed fees." *Id.* at 1065.

Thus, a charging lien does not result in a claim against the Debtor or the bankruptcy estate; it is a right to be asserted against funds earmarked for the client. But no funds were or could have been earmarked for Smith on the Petition Date, as the estate was newly formed and not yet administered. Only once the Trustee deems a payment to Smith should be made (and in light of the objection to Claim No. 5 that has been asserted, that means once that objection has been ruled on), could a right to such funds arise under the Bankruptcy Code. But again, that is a right as against Smith, not the estate.

        ii.        *The Resolution of the Charging Liens Does Not Affect the Estate*

After payment of administrative expenses and Claim No. 3 (which, though unsecured, will be paid in any event as it is the only timely filed unsecured claim and the assets far exceed the secured claims), what remains is an intercreditor dispute. The court is sorely tempted to order that the Trustee pay administrative expenses and Claim No. 3 and transfer the balance of the estate into an escrow to be paid out according to state law after Smith and Longo have exhausted their remedies against each other in a state court.

Thus, while several judges of this court have taken up the question of charging liens in bankruptcy, none that have done so appear to have considered the implications of *Stern* and there is no good, controlling precedent on the issue. *See, e.g., Herzog v. Brown, Udell, Pomerantz & Delrahim (In re Helmstetter)*, 639 B.R. 749 (Bankr. N.D. Ill. 2022) (Cox, C.J.); *In re Del Grosso*, 111 B.R. 178, 182 (Bankr. N.D. Ill. 1990) (Squires, J.).

Here, the court finds that the determination of the rights as between Longo and Smith is outside of the court's constitutional authority absent consent. While the Trustee's ability to make a distribution without the issue being resolved is affected, the resolution of Longo and Smith's charging lien questions is a third-party dispute not otherwise involving the estate. Further, as noted above, a solution exists that would take the bankruptcy estate out of the middle.

Constitutional authority might exist where the parties have consented, either expressly or impliedly, to the bankruptcy court judge hearing and determining the matter. *See, e.g., Wellness*, 575 U.S. at 669 (parties may consent to a bankruptcy court's jurisdiction); *Richer*, 798 F.3d at 490 (noting that "implied consent is good enough"); *see also In re Kirwan Offs. S.à.R.L.*, 792 F.App'x 99, 103–04

(2d Cir. 2019) (observing that *Wellness* favors consent out of policies of increasing judicial efficiency and checking gamesmanship").

In *Richer*, the Seventh Circuit observed that when the parties are represented by counsel "who can be presumed to be aware of their clients' legal rights," not challenging the bankruptcy court's constitutional authority can be deemed either implied consent or a forfeiture of the right to do so. *Richer*, 798 F.3d at 490; *see also In re Total Fin. Inv., Inc.*, Case No. 19 B 03734, 2019 WL 2432089, at *14 (Bankr. N.D. Ill. June 11, 2019) (Doyle, J.) (same); *Chatz v. Stepaniants* (*In re Fatoorehci*), 546 B.R. 786, 789 (Bankr. N.D. Ill. 2016) (Hollis, J.) (same).

It does therefore seem that the parties have consented, at least impliedly, to this court's authority over the claims resolution and the distributional issues. Certainly, no party has objected to the court exercising that authority and they have engaged fully in this matter to this point without reservation. That does not mean, however, that the court will fully and finally resolve the issues between Longo and Smith. The court can order a specific order of distribution to reflect the rights as it sees them without adjudicating those rights. *See, e.g.*, 11 U.S.C. § 502(c) (allowing a court to estimate a claim for the purposes of allowance when the actual determination of the claim "would unduly delay the administration of the case."); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356 (3d Cir. 2002) ("[t]he bankruptcy court ha[d] exclusive jurisdiction to direct the manner and the time in which such a claim is to be liquidated or estimated as to its amount, and its decision should be subject to review only on the ground of abuse of discretion.").

Out of an abundance of caution, though the court will make a determination of how the Trustee should makes distributions in light of Longo's asserted liens, it asks that if the District Court determines that this court lacked the authority to do so, it treat this Memorandum Decision instead as proposed findings and conclusions when it considers the matter *de novo*. *See, e.g.*, *FTI Consulting, Inc. v. Merit Mgmt. Group, LP*, 476 B.R. 535, 539 (N.D. Ill. 2012) (even where the bankruptcy court lacks constitutional authority, the District Court may "refer the case to the bankruptcy court [and] the bankruptcy court still may enter proposed findings of fact and conclusions of law. Indeed, '[i]t is clear that Bankruptcy Court can enter such orders,' even in core proceedings.").

       b.     *Possessory Liens and the Uniform Commercial Code*

Longo makes no claim to a possessory lien, such as might be available in attorney work product. As a result, the court offers that question no consideration here.

Longo also makes no claim to any perfection of a lien under the Uniform Commercial Code. Though the Attorney/Client Agreement does state that Longo may assert a lien in any proceeds payable to Smith, whether by settlement or judgment, for services, Attorney/Client Agreement, ¶ 9, he offers neither argument nor evidence that he has perfected that lien under Illinois's adoption of the Uniform Commercial Code. *See, e.g.*, 810 ILCS 5/9-308. As a result, the court also offers that question no consideration here.

       c.     *Attorneys Lien Act*

The Attorneys Lien Act governs aspects of the relations between Longo and Smith, Longo's client. If certain conditions are met, the Attorneys Lien Act gives an attorney a lien "upon all claims, demands and causes of action" pursued by the attorney on behalf of the client in an amount set by

agreement or, in the absence of a contractual term setting the amount of fees, a reasonable amount. 770 ILCS § 5/1.

Actual notice of the lien must be given by the attorney to the opposing party and "attorneys shall serve [such] notice in writing . . . by registered or certified mail, upon the party against whom their clients may have such suits, claims or causes of action, claiming such lien and stating therein the interest they have in such suits, claims, demands or causes of action." *Id.* The lien will attach only "from and after" the time of such service. *Id.*

Strict compliance with the terms of the Attorneys Lien Act is required. *Del Grosso*, 111 B.R. at 182 (*citing Crabb v. Robert R. Anderson Co.*, 177 Ill. App.2d 271, 276-77 (Ill. Ct. App. 1969); *Unger v. Checker Taxi Co.*, 30 Ill. App.2d 238, 240 (Ill. Ct. App. 1961)). The Attorneys Lien Act states in pertinent part:

> Sec. 1. Attorneys at law shall have a lien upon all claims, demands and causes of action, including all claims for unliquidated damages, which may be placed in their hands by their clients for suit or collection, or upon which suit or action has been instituted, *for the amount of any fee which may have been agreed upon by and between such attorneys and their clients*, or, in the absence of such agreement, for a reasonable fee, for the services of such suits, claims, demands or causes of action, plus costs and expenses. In the case of a claim, demand, or cause of action with respect to which the total amount of all liens under the Health Care Services Lien Act meets or exceeds 40% of the sum paid or due the injured person, the total amount of all liens under this Act shall not exceed 30% of the sum paid or due the injured person. All attorneys shall share proportionate amounts within this statutory limitation. If an appeal is taken by any party to a suit based on the claim or cause of action, however, the attorney's lien shall not be affected or limited by the provisions of this Act.

> To enforce such lien, such attorneys shall *serve notice in writing*, which *service may be made by registered or certified mail*, upon the party against whom their clients may have such suits, claims or causes of action, *claiming such lien and stating therein the interest they have in such suits, claims, demands or causes of action*. Such lien shall attach to any verdict, judgment or order entered and to any money or property which may be recovered, on account of such suits, claims, demands or causes of action, from and after the time of service of the notice. On petition filed by such attorneys or their clients any court of competent jurisdiction shall, on not less than 5 days' notice to the adverse party, adjudicate the rights of the parties and enforce the lien.

770 ILCS 5/0.01 (emphasis added).

Specifically, the following conditions must be present for an enforceable lien to exist: (1) The lien is for the amount of any fee which may have been agreed upon by and between such attorneys and their clients; (2) The attorney must serve notice of the attorney's claimed lien on the opposing party which details the nature of the lien and stating therein the interest the attorney has in such suits, claims, demands or causes of action; and (3) Such notice must be in writing and served by registered or certified mail. *Id.*; *Del Grosso*, 111 B.R. at 182 (*citing Olsen v. Russell (In re Kleckner)*, 93 B.R. 143, 145 (N.D. Ill. 1988); *Rhoades v. Norfolk & W. Ry. Co.*, 78 Ill.2d 217, 227-28 (Ill. 1979); *Dep't of Pub. Works v. Exchange Nat'l Bank*, 93 Ill. App.3d 390, 393 (Ill. Ct. App. 1981)).

Because such liens did not exist at common law but are creatures of statute, they must be strictly followed in order to establish the lien and right of action against the defendant for enforcement. *Mayer v. Yellow Cab Co.*, 247 Ill. App. 42, 47-48 (Ill. App. 1927) ("The statute creating the attorney's lien creates a liability unknown before the passage of the act, and where that is the case the statute must be strictly followed.") (citations omitted).

*Helmstetter*, 639 B.R. at 754. In *Helmstetter*, Chief Judge Cox held that the failure to spell out the fee was a failure to comply with the Attorneys Lien Act. *Id.* at 755 (citing to *Cazalet v. Cazalet*, 322 Ill. App. 105, 106-07 (Ill. App. 1944)).

Here, the Lien Notice states, in pertinent part, that:

Please note that the above plaintiff has placed in my hands as the plaintiff's attorney for suit or collection, a claim, demand or cause of action against you. You are further notified that the above claimant has agreed to pay compensation for services. You are notified that a lien is claimed upon the said claim, demand or cause of action.

Lien Notice.

The court is not convinced that an Illinois state court would find that the Lien Notice meets the strict requirements of the Attorneys Lien Act. *Helmstetter*, 639 B.R. at 755; *Cazalet v. Cazalet*, 322 Ill. App. at 106–07. From its plain language above, the Lien Notice fails to spell out the amount of the fee in question.

As to the elements of service, the court is also not convinced. Longo's evidence, though unrebutted, is insufficient.

Longo has given return receipts for certified mail, to be sure, but ones from the other defendants in the Prepetition Action. *See* Claim 4-5. These receipts do not match the number of the mailing to the Debtor. No return receipt has been provided for the Letter to Rosebud, and thus the Lien Notice. As the District Court has stated, "an attorney who fails to serve a party via registered or certified mail has no lien under the statute," *Chi. Title & Tr. Co. v. Chi. H & S Hotel Prop., LLC (In re Chicago H & S Hotel Prop., LLC)*, 419 B.R. 797, 801 (N.D. Ill. 2009) (internal citation omitted). The District Court has denied a claimed lien under the Attorneys Lien Act for failure to show return receipts for certified mail as Longo has also failed to do here. *Del Grosso*, 111 B.R. at 182.

As the Trustee has pointed out, the so-called mailbox rule does not apply to certified mail. *In re Marriage of Betts*, 159 Ill. App.3d 327, 332 (Ill. App. Ct. 1987) (finding failure to provide certified mail receipts made proof of service inadequate); *see also McPartlin v. C.I.R.*, 653 F.2d 1185, 1191 (7th Cir. 1981) ("The law presumes delivery of a properly addressed piece of mail. However, that presumption must be overcome as to a piece of certified mail when no receipt notice is returned.").

Still, the District Court here suggested that this court consider Longo's affidavits. These are not, however, affidavits at all. Though denominated affidavits by Longo, none is a "written declaration under oath made before some person who has authority to administer oaths." 22 C.F.R. § 92.22. As such, they are at most unsworn declarations. Longo seems to recognize that fact, by

44

referencing the provision of the Judicial Code which permits the use of unsworn declarations wherever an affidavit is required.  28 U.S.C. § 1746.

Section 1746, however, requires precise language in the unsworn declaration for it to suffice. A declaration, if executed within the United States, must state, "substantially in the following form," that "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." *Id.*

As the District Court has stated, "[i]t does not matter what a document is called. If a statement does not meet the requirements for an affidavit or a declaration, then it isn't an affidavit or a declaration.  The label doesn't control.  The package, not the packaging, is what matters." *Zavala-Alvarez v. Darbar Mgmt., Inc.*, 617 F. Supp. 3d 870, 886 (N.D. Ill. 2022), *reconsideration denied,* 19-CV-4041, 2022 WL 16832723 (N.D. Ill. Oct. 24, 2022), *appeal dismissed sub nom. Zavala-Alvarez v. Rangoonwala*, 22-3012, 2023 WL 7450650 (7th Cir. Apr. 14, 2023).  In *Zavala-Alvarez,* the District Court disallowed the use of a purported "affidavit," stating that "[i]t is not sworn, so it is not an affidavit.  And it does not include the certification under penalty of perjury, as required by statute, so it is not a declaration, either." *Id.*  It went on to state that "[a]n unsworn statement that lacks a certification under penalty of perjury has no evidentiary value (unless it is used *against* that person, like a statement of a party opponent).  From an evidentiary standpoint, it's weightless.  So the Court disregards it." *Id.*  As the District Court said in relation to section 1746, "[t]he statute spoon-feeds the magic words." *Id.*

Here, Longo too does not use the magic words required by section 1746.  Each affidavit states: "Under oath if I were called to testify, I could competently testify based upon personal knowledge …" and is verified as follows:  "Under penalties as provided by law pursuant to 28 U.S.C. § 1746 and 735 ILCS 5/1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true."

Noticeably absent in Longo's verification is a reference to "penalties of perjury."  735 ILCS 5/1-109 requires it, as does section 1746.  Longo's reference to those statutes is not enough, as it is not "substantially in the same form."  By attempting to shortcut the "magic words" with cross-references, Longo leaves himself the ability to claim that he made no reference to perjury and so cannot be held to that standard, while at the same time arguing when beneficial to him that it is substantially in the same form.

That is not substantially in the same form as section 1746.  These are not therefore admissible evidence. *Zavala-Alvarez,* 617 F. Supp. 3d at 886.  Still, the court has been here before and is now wary of concluding that Longo has failed to submit evidence to support his claim.  The court will therefore consider what the "affidavits" actually stated.

Longo states in his January 28, 2020, affidavit that he "did in fact review the return receipt requested and verified that Rosebud executed it," but could not find the return receipt when he searched for it.  Claim 4-5, Appendix vol 2, pp. 8-82, Affidavit dated January 28, 2020, at ¶¶ 9-10. Longo claims as further proof that Rosebud received the notice of attorney's lien that Rosebud acknowledged receipt when it "answered the complaint." *Id.* at ¶ 11.

As to the answer of the complaint, there are too many possible ways in which the Debtor could have been led to answer the complaint for the answer to mean *a fortiori* that the Debtor received the Lien Notice. Further, the court is wary of Longo's self-serving statements. Even if self-serving affidavits have evidentiary value, *Tangherlini*, 724 F.3d at 967 & n.1; *McKinney*, 866 F.3d at 814, the court must nonetheless give weight that evidence in light of the other known factors. It is clear to the court, both from the District Court's painstaking review of Longo's conduct in the Fee Award and his own conduct in this Chapter 7 Case, that Longo is not infallible. The errors he has committed in, for example, filing and refiling the Attorney/Client Agreement make clear that he does not always get things right the first time. The court finds it as likely as not the possibility that Longo failed to properly serve the Lien Notice as the possibility that Longo did serve it and lost the receipt.

Further, as noted above, the District Court has denied a claimed lien under the Attorneys Lien Act for failure to show certified mail receipts as Longo has also failed to do here, *Del Grosso*, 111 B.R. at 182. The court believes that the Illinois state courts would do the same.

As a result, even in consideration of Longo's "affidavits," the court cannot conclude that an Illinois court would find he as an attorneys' lien. As this is a question of distribution and Longo has not demonstrated an attorneys' lien sufficiently to interrupt the distributions here, the Trustee need not consider any claimed attorneys' lien by Longo in making distributions to Smith.[37]

> d.    *Equitable Lien*

One case the District Court instructed this court to consider is *Home Fed. Sav. & Loan Ass'n of Centralia v. Cook*, 170 Ill. App. 3d 720 (Ill. App. Ct. 1988). In *Cook*, the Illinois Appellate Court held that "[i]n Illinois, an attorney acquires an equitable lien on a judgment if the agreement between attorney and client makes an equitable assignment of a portion of the recovery, as opposed to a mere promise to pay." *Cook*, 170 Ill. App. 3d at 723.

Under Illinois law, equitable liens for attorney's fees will arise where the contract between the attorney and the client assigns a *res* or some portion thereof, usually the expected recovery in the suit in which the attorney will represent the client, to the attorney as a means of recovery. *See Lewis v. Braun*, 356 Ill. 467, 477-78 (Ill. 1934). The agreement must impose the obligation of payment of the attorney's fees on a specific *res*, such as an agreement that the attorney will be paid out of a certain percentage or portion of the recovery, as opposed, by contrast, to a general promise by the client to pay fees using certain funds. *See, e.g., id.* at 57–58, 60–61; *Hull v. Culver*, 143 Ill. 506, 510-11 (Ill. 1892); *Dep't of Pub. Works*, 93 Ill. App.3d at 393 (*citing Cameron v. Boeger*, 200 Ill. 84, 91-92 (Ill. 1902)). When there exists a sufficiently compliant promise, the law presumes an equitable assignment and thus imposes an equitable lien. *Lewis*, 356 Ill. at 477–78 ("An equitable assignment

---

[37]    The court therefore does not decide the rights between Smith and Longo except to determine that the Trustee is free to follow the statutory scheme of distribution in this regard. A determination of those rights otherwise is outside of this court's constitutional authority. *Stern*, 564 U.S. at 503; *Celotex*, 514 U.S. at 308 n.6; *Bush*, 2024 WL 1854093. Even if it were to be later determined that the parties had fully consented and waived the constitutional limitations of this court's authority, the court would decline to determine these matters fully and finally. In the interests of justice, it would abstain. 11 U.S.C. § 1334(c)(1). This intercreditor dispute has gone on far too long and the parties' disputes may be adjudicated in another court without changing the outcome here.

is such an assignment as gives the assignee a title which, though not cognizable at law, equity will recognize and protect. *Story v. Hull*, 143 Ill. 506, 32 N. E. 265; Abbott's Law Dict.")

A mere promise to pay reasonable compensation out of litigation proceeds is insufficient. *Cameron v. Boeger*, 200 Ill. at 91-92; *LaSalle Bank, N.I. v. First Am. Bank*, 316 Ill. App.3d 515, 525 (Ill. Ct. App. 2000) (applying the same principles to deny a request to impose an equitable lien where the language of a contract for the sale of land did not support the existence of such a lien).

In *Brass Kettle*, the Seventh Circuit considered such an equitable lien in the context of a potential preferential transfer. *Id.* at 576. It concluded that a promise to pay with the specificity noted above gave rise to an equitable lien, not an assignment. Presumably, had the Seventh Circuit concluded that an assignment had existed, it would have found grounds for a preferential transfer. Instead, it found there were none. *Id.*

This leads the court to conclude that there are three possible approaches to a potential equitable attorneys' lien: (1) The agreement might by a mere general promise to pay compensation out of litigation proceeds, in which case no equitable lien attaches; (2) The agreement instead might impose a defined obligation to pay on a specific *res*, in which the law may derive an equitable assignment giving rise to an equitable lien; and (3) The agreement might expressly assign the rights to the attorney, in which case the express assignment governs and no remedy in equity is appropriate.

In the Attorney/Client Agreement, Smith agrees "to pay my attorney … 33-1/3% of any recovery obtained on my behalf prior to the filing of the lawsuit/complaint, 40% of any recovery after the lawsuit/complaint is filed, and 45% of any recovery once a trial date is set." [Claim 4-9, p.5] This language is identical to the language in *Brass Kettle* and *Cook*. *Brass Kettle,* 790 F.2d at 575; *Cook*, 170 Ill. App.3d at 724. The agreement in *Brass Kettle* stated that "the undersigned agree to pay the firm … forty percent (40%) of any recovery." *Brass Kettle,* 790 F.2d at 575. The agreement in *Cook* provided "[w]e agree to pay said attorneys a contingent fee of 40% of any monies received." *Cook*, 170 Ill. App.3d at 724.

In both cases, the court found that such language constituted an equitable assignment. *Brass Kettle,* 790 F.2d at 575; *Cook*, 170 Ill. App.3d at 724. Here, using substantially similar language, the Attorney/Client Agreement between Longo and Smith constituted an equitable assignment. Per express terms of the Attorney/Client Agreement, Smith agreed to a lien in his recoveries. As a result, the court believes that an Illinois court would conclude that Longo may assert an equitable lien.

In this instance, Longo should be pleased however that his equitable lien is no different than the attorneys' lien in that it is a claim against Smith's recoveries and not the bankruptcy estate. Were it a claim against the estate, it would be avoidable under section 522(f)(1) per the Seventh Circuit's express holdings. *In re Sanderfoot*, 899 F.2d 598, 605 (7th Cir. 1990), *rev'd on other grounds sub nom. Farrey v. Sanderfoot*, 500 U.S. 291, 111 S. Ct. 1825 (1991). In *Sanderfoot*, the Seventh Circuit found that equitable liens were judicial liens by another name and thus within the definition of the same under the Bankruptcy Code. 11 U.S.C. § 101(32). As a result, such liens were avoidable. 11 U.S.C. § 522(f)(1). On *certiorari*, the Supreme Court reversed on one limited ground that the debtor must show it had an interest in the property to which the lien attached prepetition, at the time the lien attached. *Farrey*, 500 U.S. at 301. That is consistent with this court's holding here. The lien is not a

47

claim against the estate as it did not attach at the Petition Date.  Had it, however, it would be avoidable.

That is not to say, however, that such a lien is unlimited.  "[T]he purpose of an equitable lien is to prevent unjust enrichment." *Villalobos v. BAC Home Loans Servicing LP*, Case No. 12-CV-281-JPS, 2012 WL 1853382, at *2 (E.D. Wis. May 21, 2012) (*quoting Kepler v. Koch (In re Kirchner)*, 372 B.R. 459, 463 (Bankr. W.D. Wis. 2007)) (adopting the bankruptcy court's proposed findings and conclusions which declined to enforce an equitable lien as the result did not unjustly enrich the property owner).

There is nothing inequitable about allowing Longo to enforce such a lien, provided the result does not deny Smith any recovery in the case.  Longo's own Attorney/Client Agreement, for example, does not indicate examples of when his fees might result in no recovery for the client, only diminished ones.[38]  Allowing Longo to enforce an equitable lien against Smith's recoveries for the purposes of securing Longo's recovery of the Percentage Recovery, but no further, is equitable.  The court will not countenance using the equitable lien argument to assert that all recoveries must come to Longo.  That is not a fair reading of the various documents involved and it certainly would not achieve an equitable result.

Longo's claim to an equitable lien in the distributions should thus be respected by the Trustee, insofar as the Trustee should respect Longo's claim for the Percentage Recovery when making distributions to Smith.[39]

> 4.      *Claim No. 4 in Light of the Foregoing*

Claim No. 4 as, noted above, consists of four separate amounts: (1) the Fee Award; (2) the Percentage Recovery; (3) interest; and (4) and the Post-judgment Fees.  *See* Claim No. 4-7, Exh., pp. 1-2.  In light of the foregoing, the court will take up each component in turn.  The court will also consider the question of interest in the Original Claim in light of its analysis here.

> a.      *The Fee Award*

As noted above, the court's conclusion that the Fee Award was unsecured was affirmed by the District Court in the Remand.  *Longo*, 638 B.R. at 603 ("[T]he Bankruptcy Court's finding that the 2017 judgment did not create a secured lien in Longo's favor is affirmed.").  The analysis in the Original Decision was not specific to Longo but rather the nature of the Recorded Judgment and

---

[38]     While these examples are given in the context of a settlement, it would be reasonable to assume that they, at least in part, set expectations for Smith in the instance of any recovery. *Id.* at ¶ 8.  The Attorney/Client Agreement is, quite frankly, one of the most perplexing contracts this court has encountered.  Thankfully it is not necessary for this court to interpret it further.

[39]     By expressly declining to rule on the issues between Longo and Smith, those issues are preserved.  Should Longo argue in another court that the various documents afford him the right to take all recoveries from the Prepetition Action and for Smith to receive nothing, he is not restrained by this Memorandum Decision nor its subsequent order from seeking recovery from Smith.  The court determines the issues here solely for the limited issue of whether the Trustee should redirect a portion of Smith's recoveries.  Having determined the distribution issues, the court's role here is done.

the Fee Award.  As a result, though the wording was specific to Longo, the fact that the Fee Award is unsecured is the law of this case.

Further, with respect to the amount of the Fee Award, as noted above, the court sees no other reason to take up the Fee Award at anything other than its face amount.  The District Court's ruling in the Fee Award is thoughtful and complete.  No argument raised by Longo convinces the court that the result on appeal would be any different, and the court sees no reason to exercise its discretion and alter the law of the case on this issue.

The court will, however, refrain from ruling on the Fee Award as part of Claim No. 4 until taking up the issue of interest, below.

     b.  *The Percentage Recovery*

The objections to Longo's inclusion of the Percentage Recovery in Claim No. 4 are well taken.  Longo has no claim against the bankruptcy estate for the Percentage Recovery for the reasons discussed above.

Nonetheless, the court directs the Trustee to honor Longo's equitable lien in Smith's recoveries with respect to the Percentage Recovery.  All distributions to Smith from the Chapter 7 Case must be divided per the Attorney/Client Agreement so that fifty-five percent of the recovery is paid to Smith and forty-five percent of the recovery is paid to Longo.

As a result, Longo's claim for the Percentage Recovery is neither a claim against the Debtor nor one against the Debtor's property and must be disallowed.  The existence of a lien remains germane, however, and will be discussed in more detail below.

     c.  *Interest*

But for Post-Judgment Fees, the only claim that Longo has directly against the estate thus far is the Fee Award portion of Claim No. 4.  The Fee Award portion of the claim, though unsecured, is entitled to prepetition interest.  28 U.S.C. § 1961(a).  Section 1961(a) applies on its face to money judgments and the Fee Award appears to be just such a judgment.  It would not, however, be entitled to postpetition interest as the Fee Award was unsecured and no exception as per section 506(a) could apply.  11 U.S.C. § 502(b)(2); 11 U.S.C. § 506(a).

As a result, the Fee Award portion of Claim No. 4 for is entitled to interest under section 1961, running from the date of the Fee Award, August 23, 2018.  Here, the court can calculate that interest simply.  Interest at the federal rate would have accrued from August 23, 2018, to but not including the Petition Date, August 31, 2018.  The Fee Award was thus entitled to 10 days of interest at the federal rate of 1.23%.  As a result, the Fee Award was entitled to $207.30 in prepetition interest (10 days at the daily rate of $20.73).

Claim No. 4 is therefore entitled to be allowed as an unsecured claim in the amount $615,464.51 ($615,257.21 plus $207.30).

The Fee Award Claim is not, however, entitled to postpetition interest as the Fee Award was unsecured and no exception as per section 506(a) could apply.  11 U.S.C. § 502(b)(2); 11 U.S.C. § 506(a).  The court's conclusion that the Fee Award was unsecured was affirmed by the District

Court in the Remand. *Longo*, 638 B.R. at 603 ("[T]he Bankruptcy Court's finding that the 2017 judgment did not create a secured lien in Longo's favor is affirmed.").

As a result, any Objection to the Fee Award portion of Claim No. 4 as an unsecured claim in the amount of $615,464.51 is overruled. Any Objection to the Fee Award portion of Claim No. 4 as being anything other than an unsecured claim in the amount of $615,464.51 is sustained.

d.      *Post-Judgment Fees*

Longo claims Post-Judgment Fees totaling $321,420.00. This request for the Post-Judgment Fees is in large part misplaced, for a number of reasons. While the court accepts that such fees *might* fall within the scope of compensable fees of Smith and thus would be Longo's to assert under the Assignment, the problems with the request overwhelm the court's ability to rule on it.

A determination of the Post-Judgment Fees was done in Original Decision which, excluded recoveries on the Post-Judgment Fees. Longo did not appeal the Original Decision on that ground. As a result, that issue would ordinarily be forfeited. *Funds*, 901 F.3d at 767 n.5; *Holder*, 634 F.3d at 835 n.3. It is the law of this case.

Still, the court recognizes that the New Bar Date Order might be construed to revive this issue, that section 502(j) might be invoked as cause for reconsideration and that the District Court might not respect this court's authority over the questions. As a result, the court will nonetheless make several observations regarding this request.

First, Longo provides a single set of mostly undifferentiated billing records to support his claim. They are nearly 7,000 lines long. Those voluminous records include time entries from the date of the Fee Award and before. The District Court already ruled on those requests in the Fee Award. Longo nonetheless sought those same fees from this court. The court has not considered those records here. They also include time entries extending beyond the Petition Date. As noted above, claims are determined at the Petition Date. Longo's actions after the Petition Date are his own to bear.

Second, while Longo fails to address this, Longo withdrew as Smith's attorney on December 12, 2018, when he emailed Smith, stating "the attorney contract between you [Smith] and us [Longo] ended. We can no longer represent you." [Dkt. 296, p.1; Ex. B]. From that point on, if not before, Longo is no longer acting with respect to Smith's claim, but rather his own. That has implications on both his bankruptcy claim and the fee-shifting statues involved. Longo gives the court no direction regarding this and there are limits to what the court is willing to do on the parties' behalf. As Judge Dow made clear in the Fee Award, fees for fees is disfavored. Fee Award at pp. 36-48. Longo's actions after the withdrawal are also his own to bear.

Third, Longo seeks recovery of costs involved in representation of Smith, but nothing in the Assignment or the Attorney/Client Agreement appears to allow Longo to assert those costs on behalf of Smith. *See, e.g.*, Attorney/Client Agreement, ¶ 6. Smith assigned his right to fees, not costs. It does not appear that Longo has standing to seek recovery of Smith's costs against the bankruptcy estate.

Fourth, Longo reverts his claim for the Post-Judgment Fees to the higher hourly rate rejected by the District Court. He seeks an hourly rate of $550/hour, though the District Court

rejected that rate and, after a fulsome inquiry into Longo's rate in other matters and applying the various standards under the law, concluded that a more appropriate rate was $360/hour.  Fee Award, at pp. 5-11.  The court sees no reason to vary from that rate.  True, time has passed, but Longo's billing and overall judgment has not improved.  He shows no indication that he took Judge Dow's criticisms to heart.  Instead, Claim No. 4 has every appearance of being exactly of the same nature as the billing Judge Dow took great pains to demonstrate the folly of.

Here, were the court to engage in the exercise in futility of determining the Post-Judgment Fees, it would add months to this analysis.  During that time, the estate would continue to diminish with banking fees and other administrative expenses.[40]

Instead, it is forced to do so by estimation.  11 U.S.C. § 502(c); *Midway Motor Lodge*, 54 F.3d at 409.  As the Fee Award already demonstrates that the allowance of such fees is discretionary, a clearer case for estimation under section 502(c) will likely not be found.  Fee Award, at p. 37 (citing *In re Burlington N., Inc. Employment Practices Litig.*, 832 F.2d 430, 434 (7th Cir. 1987) ("a fees award for fees litigation can be reduced, even to nothing, so that the award is "reasonable" when considered "in light of all the circumstances of the case."")).

In making such an estimate, the court would follow the lead of Judge Dow.  In rejecting much of Longo's requested fees, Judge Dow found multiple categories of inappropriate fees, including fees for excessive, redundant or unnecessary work such as receiving and reviewing correspondence, administrative work or work better suited for support staff, work that was billable the reduced rate of a paralegal and billing that was inaccurate.  Fee Award, *et passim*.

In reviewing Longo's time entries, the court has seen copious examples of these types of excessive, redundant and unnecessary tasks, over ninety hours of them.  The court has also observed over eight hours of time better spent by a paraprofessional.  Finally, the court sees over thirty hours of block-billed and vague time entries.  After having conducted an additional, top-level review of these time sheets at the hourly rate provided by the District Court, the court estimates the allowable portion over the Post-Judgment Fees is $134,008.20.

To be clear, given the imprecision in Longo's disclosures and the enormous, undifferentiated task Longo has dropped on the court without any effort to make his timesheets easily discernible, were the court required to do more than estimate, it would be inclined to reduce the claim to zero in light of all of the circumstances.  *Burlington N.*, 832 F.2d at 434.  The court would also be forced to take up whether and to what effect section 510(c) would apply. 11 U.S.C. § 510(c); *Pepper v. Litton*, 308 U.S. 295, 306 (1939); *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1350 (7th Cir. 1987).

Because, as set forth below, this will not affect the outcomes or distribution in any meaningful way, the concludes that estimation and in the manner set forth above is appropriate.

---

[40]      Based on the estate's asset report used herein, the monthly banking fees alone are approximately $1,200.00.  Individual Estate Property Record and Report of Asset Cases [Dkt. No. 235].

As a result, the Post-Judgment Fee portion of the Claim No. 4 is estimated at $134,008.20. This results in a total allowed, unsecured claim under Claim No. 4 as $749,472.71. Any request beyond this amount is disallowed.[41]

E.      Distributions

One of the reasons for the court's determinations of the futility in considering much of Longo's requests in Claim No. 4 is the reality of the recoveries in this case. As noted above, adding to Longo's unsecured claim will result in only a miniscule variation of recoveries. This is demonstrated by looking at the distribution priorities.

As of the last asset report of the Trustee, the Trustee indicated that on June 30, 2022, there existed $684,755.11 in liquid estate assets. Individual Estate Property Record and Report of Asset Cases [Dkt. No. 235]. From that, there are only three claims to be paid: Claim No. 3, Claim No. 4 and Claim No. 5.

Of these, only Claim No. 5 is secured and the property in question has a value that exceeds the total claim, including with respect to postpetition interest. Trustee's Report of Sale [Dkt. No. 120]. In accordance with this Memorandum Decision and sections 725 and 726(a)(4) of the Bankruptcy Code, the Actual Damages portion of Claim No. 5 must be paid first, but the remainder will be subordinated. Further, pursuant to this Memorandum Decision, the Trustee must respect Longo's equitable lien to afford him his Percentage Recovery. That means that, based on the numbers in this Memorandum Decision, Smith will receive $163,973.05 and Longo will receive $134,159.77. Using the $684,755.11 number above, that means that after the payment of Smith and Longo, the estate will have $386,622.29 remaining.

Following Claim No. 5 will be administrative and other priority claims entitled to payment under section 726(a)(1). There is no clear estimate of such claims so the court will, only for the sake of demonstration, presume there are none.

Following that will be Claim No. 3 and Claim No. 4, each as timely filed unsecured claims and thus will be paid ratably under section 726(a)(2)(A). With Claim No. 3 being $25,406.00 and Claim No. 4 being $749,472.71, that means that Claim No. 3 will receive 3.28% of the remaining estate assets and Claim No. 4 will receive 96.72% of them. Again, using the numbers above, that means Claim No. 3 will receive $12,676.22 and Claim No. 4 will receive $373,946,37.

Following that, the Punitive Damages portion of Claim No. 5 would be paid, if any assets remained. But none do.

Assume for the moment, that the court would take the time to review the nearly 7,000 lines of Longo's timesheets and did allow his Post-Judgment Fees at a number as requested, in the amount of $321,420.00. This would take the court several additional months given the resources

---

[41]      Once again, as a point of clarity, disallowance of the claim is not a ruling on the merits of the underlying issues. Should Longo have another avenue of pursuit for these Post-Judgment Fees, he is free to pursue it. It simply means that he cannot seek recovery of those claims from the bankruptcy estate.

that are available to it.  As noted above, during that time, the estate would continue to diminish with banking fees and other administrative expenses.  To what end?

With Claim No. 3 would still be $25,406.00, but Claim No. 4 would total $936,88.51, meaning that Claim No. 3 will receive 2.64% of the remaining estate assets and the Claim No. 4 will receive 97.36% of them.  Again, using the numbers above, that means Claim No. 3 will receive $10,297.45 and Claim No. 4 will receive $376,415.15.

In other words, Longo's recovery on Claim No. 4 would increase by approximately $2,400.00, while at the same time, the estate's assets would be depleted by approximately $2,400.00. Pursuing this matter further is exactly the kind of exercise in futility the Seventh Circuit must have had in mind in *Kiger*.  *Kiger*, 417 F.2d at 1196.

That means there is no point considering the Post-Judgment Fees here and that such a determination is outside of this court's constitutional authority.  *Stern,* 564 U.S. at 503; *Celotex*, 514 U.S. at 308 n.6; *Bush*, 2024 WL 1854093; *see also Stolfo*, 727 Fed. Appx. at 865; *Kiger*, 417 F.2d at 1196; *Mesa Bus. Park*, 127 B.R. at 147; *Richardson,* 97 B.R. at 162; *Mendiola*, 99 B.R. at 866–68.

Thus, there is no need to increase the amount of Claim No. 4 beyond that which it currently contains and no reason to belabor this two-party dispute further.

CONCLUSION

For the foregoing reasons, the court will enter an order sustaining the Objections in part and overruling the Objections in part, in the manner set forth herein.  An order to that effect will be entered contemporaneously with the entry of this Memorandum Decision.

Dated: April 30, 2024                    ENTERED:

_____
Timothy A. Barnes, Judge
United States Bankruptcy Court

53

Table A

Prepetition Claims

Table A
Prepetition Claims*

| Principal Balance | Starting Period | Ending Period | Days | Accumulated Interest | Payment | Net Accumulated Interest | Payment to Principal | Payment to Interest | New Principal Balance | New Overall Balance | Actual Damages Balance | Punitive Damages Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 559,656.57 | 7/14/17 | | | $ - | $ - | | | | $ 559,656.57 | $ 559,656.57 | $ 279,656.57 | $ 280,000.00 |
| $ 559,656.57 | 7/14/17 | 1/23/18 | 193 | $ 3,639.91 | $ - | $ 3,639.91 | $ - | $ - | $ 559,656.57 | $ 563,296.48 | $ 281,475.41 | $ 281,821.07 |
| $ 559,656.57 | 1/23/18 | | | $ - | $ 15,000.00 | $ 3,639.91 | $ 11,360.09 | $ 3,639.91 | $ 548,296.48 | $ 548,296.48 | $ 279,656.57 | $ 268,639.91 |
| $ 548,296.48 | 1/23/18 | 2/1/18 | 9 | $ 166.29 | $ - | $ 166.29 | $ - | $ - | $ 548,296.48 | $ 548,462.78 | $ 279,739.66 | $ 268,723.11 |
| $ 548,296.48 | 2/1/18 | | | $ - | $ 5,000.00 | $ 166.29 | $ 4,833.71 | $ 166.29 | $ 543,462.78 | $ 543,462.78 | $ 279,656.57 | $ 263,806.21 |
| $ 543,462.78 | 2/1/18 | 3/1/18 | 28 | $ 512.79 | $ - | $ 512.79 | $ - | $ - | $ 543,462.78 | $ 543,975.57 | $ 279,912.81 | $ 264,062.76 |
| $ 543,462.78 | 3/1/18 | | | $ - | $ 5,000.00 | $ 512.79 | $ 4,487.21 | $ 512.79 | $ 538,975.57 | $ 538,975.57 | $ 279,656.57 | $ 259,319.00 |
| $ 538,975.57 | 3/1/18 | 4/1/18 | 31 | $ 563.04 | $ - | $ 563.04 | $ - | $ - | $ 538,975.57 | $ 539,538.61 | $ 279,937.92 | $ 259,600.69 |
| $ 538,975.57 | 4/1/18 | | | $ - | $ 5,000.00 | $ 563.04 | $ 4,436.96 | $ 563.04 | $ 534,538.61 | $ 534,538.61 | $ 279,656.57 | $ 254,882.04 |
| $ 534,538.61 | 4/1/18 | 5/1/18 | 30 | $ 540.40 | $ - | $ 540.40 | $ - | $ - | $ 534,538.61 | $ 535,079.01 | $ 279,926.60 | $ 255,152.41 |
| $ 534,538.61 | 5/1/18 | | | $ - | $ 5,000.00 | $ 540.40 | $ 4,459.60 | $ 540.40 | $ 530,079.01 | $ 530,079.01 | $ 279,656.57 | $ 250,422.44 |
| $ 530,079.01 | 5/1/18 | 6/1/18 | 31 | $ 553.75 | $ - | $ 553.75 | $ - | $ - | $ 530,079.01 | $ 530,632.76 | $ 279,933.28 | $ 250,699.48 |
| $ 530,079.01 | 6/1/18 | | | $ - | $ 5,000.00 | $ 553.75 | $ 4,446.25 | $ 553.75 | $ 525,632.76 | $ 525,632.76 | $ 279,656.57 | $ 245,976.19 |
| $ 525,632.76 | 6/1/18 | 7/1/18 | 30 | $ 531.39 | $ - | $ 531.39 | $ - | $ - | $ 525,632.76 | $ 526,164.15 | $ 279,922.10 | $ 246,242.05 |
| $ 525,632.76 | 7/1/18 | | | $ - | $ 5,000.00 | $ 531.39 | $ 4,468.61 | $ 531.39 | $ 521,164.15 | $ 521,164.15 | $ 279,656.57 | $ 241,507.58 |
| $ 521,164.15 | 7/1/18 | 7/14/18 | 13 | $ 228.31 | $ - | $ 228.31 | $ - | $ - | $ 521,164.15 | $ 521,392.46 | $ 279,770.66 | $ 241,621.81 |
| $ 525,632.76 | 7/14/18 | | | $ - | $ - | $ - | $ - | $ - | $ 521,392.46 | $ 521,392.46 | $ 279,770.66 | $ 241,621.81 |
| $ 521,392.46 | 7/14/18 | 8/1/18 | 18 | $ 316.26 | $ - | $ 316.26 | $ - | $ - | $ 521,392.46 | $ 521,708.73 | $ 279,928.69 | $ 241,780.04 |
| $ 521,392.46 | 8/1/18 | | | $ - | $ 5,000.00 | $ 316.26 | $ 4,683.74 | $ 316.26 | $ 516,708.73 | $ 516,708.73 | $ 279,770.66 | $ 236,938.07 |
| $ 516,708.73 | 8/1/18 | 9/1/18 | 31 | $ 539.78 | $ - | $ 539.78 | $ - | $ - | $ 516,708.73 | $ 517,248.51 | $ 280,040.38 | $ 237,208.13 |
| $ 516,708.73 | 9/1/18 | | | $ - | $ 5,000.00 | $ 539.78 | $ 4,460.22 | $ 539.78 | $ 512,248.51 | $ 512,248.51 | $ 279,770.66 | $ 232,477.86 |
| | | | | | $ 55,000.00 | | ** | | | A | B | C |

Legend:
Compound
Total Claim     A
Actual Damages  B
Punitve Damages C

* Interest is at the rate of 1.23%, computed daily and compounded annually in accordance with 28 U.S.C. § 1961.

** Payments are applied first to pay down interest on both Actual Damages and Punitive Damages then applied to Punitive Damages principal balance.

Table B

Postpetition Interest

Table B
Postpetition Interest*

| Principal Balance | Starting Period | Ending Period | Days | Accumulated Interest | Net Accumulated Interest | Actual Damages Interest | Punitive Damages Interest |
|---|---|---|---|---|---|---|---|
| $ 512,248.51 | 9/1/18 | | | | | $ 279,770.66 | $ 232,477.85 |
| $ 512,248.51 | 9/1/18 | 9/1/19 | 365 | $ 6,300.66 | $ 6,300.66 | $ 3,148.40 | $ 3,152.26 |
| $ 518,549.17 | 9/1/19 | 9/1/20 | 366 | $ 6,395.63 | $ 12,696.29 | $ 6,344.25 | $ 6,352.04 |
| $ 524,944.80 | 9/1/20 | 9/1/21 | 365 | $ 6,456.82 | $ 19,153.11 | $ 9,570.68 | $ 9,582.43 |
| $ 531,401.62 | 9/1/21 | 9/1/22 | 365 | $ 6,536.24 | $ 25,689.35 | $ 12,836.79 | $ 12,852.56 |
| $ 537,937.86 | 9/1/22 | 9/1/23 | 365 | $ 6,616.64 | $ 32,305.98 | $ 16,143.08 | $ 16,162.90 |
| $ 544,554.49 | 9/1/23 | 4/30/24 | 242 | $ 4,440.88 | $ 36,746.86 | $ 18,362.16 | $ 18,384.71 |
| | | | | | | A | B |

Legend:
Compound
Total Interest Actual Damages    A
Total Interest Punitive Damages  B

* Interest is at the rate of 1.23%, computed daily and compounded annually in accordance with 28 U.S.C. § 1961.